United States Court of Appeals,

Eleventh Circuit.

No. 94-4595.

LIFECARE INTERNATIONAL, INCORPORATED, a California corporation, Plaintiff-Appellee,

v.

CD MEDICAL, INC., a Delaware corporation, CD Medical B.V., a Dutch corporation, Defendants-Appellants.

Nov. 7, 1995.

Appeal from the United States District Court for the Southern District of Florida. (No. 90-283-CIV-FAN), Federico A. Moreno, Judge.

Before EDMONDSON, Circuit Judge, HILL, Senior Circuit Judge, and MILLS,[1] District Judge.

RICHARD MILLS, District Judge:

Should the arbitration award be set aside on the ground that one of the arbitrators was biased?

If that issue falls, was the arbitration award arbitrary and capricious?

The district court rejected both grounds and affirmed the arbitration award.

We agree and affirm.

## I. BACKGROUND

Appellant, CD Medical, Inc., manufactures dialysis machines and the disposable components used on those machines; they also directly market those machines and disposable components in the United States. Outside of the United States, the products were marketed through several wholly-owned subsidiaries, including

---

[1]Honorable Richard Mills, U.S. District Judge for the Central District of Illinois, sitting by designation.

Appellant, CD Medical B.V. CD Medical B.V., in turn, markets the products through either its wholly-owned subsidiaries or independent contractors. Appellee, Lifecare International, Inc. ("Lifecare"), was one of those independent contractors.

In 1990, Lifecare sued CD Medical, Inc., and CD Medical, B.V., in the United States District Court for the Southern District of Florida for breach of contract, fraud, and tortious interference.[2] Pursuant to the Federal Arbitration Act and a 1984 agreement between the parties, CD Medical moved to compel arbitration and to stay the district court proceedings. Over Lifecare's objection, the district court granted CD Medical's motion to compel arbitration and ordered the parties to arbitrate.

In June of 1992, Lifecare filed its demand for arbitration. The demand claimed that: (1) CD Medical breached a February 1987 oral agreement to return the country of Algeria to Lifecare's exclusive territory; (2) CD Medical breached a written February 1988 settlement agreement which also returned Algeria to Lifecare's exclusive territory; (3) CD Medical breached a December 1988 written agreement which returned Algeria to Lifecare for the 1989 year; and (4) CD Medical tortiously interfered with Lifecare's advantageous business relationship with the Algerian Government. Lifecare sought damages for lost profits from sales it would have made in Algeria in the amounts of $10,731,313 for 1988 and $13,557,562 for 1989, along with prejudgment interest and punitive damages.

---

[2]From this point forward, CD Medical, Inc., and CD Medical, B.V., will be collectively referred to as "CD Medical," unless otherwise indicated.

In February 1993, the liability portion of the trial was conducted before a three-member arbitration panel. The principal hearing consumed seventeen days, ending on February 24, 1993. During a break in the hearings in February, Arbitrator Craig Stein, an attorney, recounted an incident in which he was personally involved where opposing counsel refused to reschedule a summary judgment hearing so that he could travel abroad. Arbitrator Stein apparently described such conduct as unprofessional, and in his opinion, it warranted disciplinary action.

On April 27, 1993, the arbitrators informed the parties that they intended to rule in Lifecare's favor on liability. Sometime thereafter, one of the White & Case attorneys representing CD Medical discovered that the "opposing counsel" to whom Arbitrator Stein had previously referred to was another attorney who was employed at White & Case.[3] Consequently, CD Medical sought to disqualify Arbitrator Stein. The American Arbitration Association denied the motion to disqualify and the proceedings continued.

On November 18 and 19, and December 16, 1993, the arbitrators heard testimony regarding the amount of damages. On January 14, 1994, Arbitrator Stein and another arbitrator awarded Lifecare $10,102,674 in lost profits, $5,394,203.90 in prejudgment interest, $13,527.47 in administrative fees and costs, $71,485.06 in arbitrators' fees and expenses, and $39,048 in expert witness fees. Neither Arbitrator Stein nor the other arbitrator who joined in the

---

[3]Arbitrator Stein was apparently so upset from the incident that he drafted a letter to the White & Case attorney which stated that he could not believe that "a firm of White & Case's stature would condone [that] type of behavior."

majority decision issued an opinion explaining their reasoning for finding CD Medical liable or justifying the amount of damages. The dissenting arbitrator wrote a three-page opinion addressing only the issue of liability.

Thereafter, CD Medical discovered that Arbitrator Stein failed to disclose two prior contacts between CD Medical and the law firm that he became "of counsel" to, Greenberg Traurig Hoffman Lipoff Rose & Quentel, P.A. ("Greenberg Traurig"). The most recent contact occurred in January of 1990 when CD Medical interviewed Greenberg Traurig to represent them in the instant dispute. The prior contact complained of occurred in 1988 when CD Medical asked Greenberg Traurig to review an amendment to the exclusive agreement between CD Medical and Lifecare. Arbitrator Stein became "of counsel" to Greenberg Traurig a few months before he was selected as an arbitrator in this case in November of 1992.

Subsequently, Lifecare moved to confirm and CD Medical moved to vacate the award in the district court. In support of its motion to vacate, CD Medical first argued that Arbitrator Stein was biased. In support of their assertion that there was evident partiality, *i.e.,* bias, on the part of Arbitrator Stein, CD Medical argued that Arbitrator Stein failed to disclose the prior scheduling dispute with the White & Case attorney and that he also failed to disclose the two prior contacts between CD Medical and the firm he became "of counsel" to, Greenberg Traurig. Second, CD Medical claimed that the award was arbitrary and capricious.

On April 28, 1994, the district court, in a three-paragraph order, denied CD Medical's motion to vacate and granted Lifecare's

motion to confirm the arbitration award.  A final judgment was entered on June 14, 1994, and this appeal ensued.

## II. STANDARD OF REVIEW

As a result of the Supreme Court's recent decision in *First Options of Chicago, Inc. v. Kaplan,* --- U.S. ----, ----, 115 S.Ct. 1920, 1926, 131 L.Ed.2d 985 (1995), the Eleventh Circuit will no longer review a district court's confirmation of an arbitration award under an "abuse of discretion" standard.  Instead, the courts are instructed to review the district court's factual findings for "clear error" and examine its legal conclusions *de novo. Davis v. Prudential Sec., Inc.,* 59 F.3d 1186, 1188 (11th Cir.1995).

## III. DISCUSSION

On appeal, CD Medical raises the same issues that were before the district court;  namely, (1) whether Arbitrator Stein's failure to disclose his prior contact with the White & Case attorney and/or his failure to disclose the two prior contacts between CD Medical and Greenberg Traurig (the firm he later became "of counsel" to) evidence bias on Arbitrator Stein's part, and (2) whether the award was arbitrary and capricious.

A. Review of Arbitration Awards Generally

Our review of commercial arbitration awards is controlled by the Federal Arbitration Act ("FAA").  *See* 9 U.S.C. §§ 1-16.  As stressed by this Court on numerous occasions, "[i]t is well settled that judicial review of an arbitration award is narrowly limited." *Davis,* 59 F.3d at 1190;  *accord, Brown v. Rauscher Pierce Refsnes, Inc.,* 994 F.2d 775, 778 (11th Cir.1993);  *Robbins v. Day,* 954 F.2d 679, 682 (11th Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct.

201, 121 L.Ed.2d 143 (1992). Indeed, "the FAA presumes that arbitration awards will be confirmed," *Davis,* 59 F.3d at 1190; *Brown,* 994 F.2d at 778, consequently, "federal courts should defer to the arbitrator's resolution of the dispute whenever possible." *Robbins,* 954 F.2d at 682.

The FAA enumerates only four narrow bases for vacating the arbitration award; one of which is applicable in the instant case. That is, pursuant to § 10(a)(2), the award may be vacated "[w]here there is evident partiality or corruption in the arbitrators, or either of them."[4] In addition to the statutory grounds for vacatur, the Eleventh Circuit has recognized two non-statutory bases for vacating an arbitration award. *Brown,* 994 F.2d at 779. One of the non-statutory grounds is at issue in the instant case; whether the arbitration award was arbitrary and capricious.[5] *Id.* (citations omitted).

Each of the two bases for vacating the award will be addressed in turn.

B. Evident Partiality

In order to vacate on the ground of evident partiality in a nondisclosure case, the party challenging the arbitration award must establish that the undisclosed facts create a "reasonable impression of partiality." *Middlesex Mut. Ins. Co. v. Levine,* 675 F.2d 1197, 1201 (11th Cir.1982); *Schmitz v. Zilveti,* 20 F.3d 1043,

---

[4]For the other three statutory bases for vacating an arbitration award, *see* 9 U.S.C. § 10(a)(1), (3), and (4).

[5]The second non-statutory ground recognized in the Eleventh Circuit for vacating an arbitration award is when the award is contrary to public policy. *Brown,* 994 F.2d at 779.

1046 (9th Cir.1994). This Court has reasoned that the alleged partiality must be "direct, definite and capable of demonstration rather than remote, uncertain and speculative." *Levine,* 675 F.2d at 1201; *accord, Consol. Coal v. Local 1643, United Mine Workers,* 48 F.3d 125, 129 (4th Cir.1995); *Health Services Management Corp. v. Hughes,* 975 F.2d 1253, 1264 (7th Cir.1992). Accordingly, the mere appearance of bias or partiality is not enough to set aside an arbitration award. *Consol. Coal,* 48 F.3d at 129; *Health Services Management Corp.,* 975 F.2d at 1264; *Florasynth, Inc. v. Pickholz,* 750 F.2d 171, 173 (2nd Cir.1984); *see Schmitz,* 20 F.3d at 1046-47 (rejecting "appearance of bias" standard).

As noted, CD Medical offers two independent reasons for vacating the arbitration award on the ground of evident partiality. First, CD Medical claims that Arbitrator Stein's failure to disclose the scheduling dispute with a White & Case attorney (the law firm that represented CD Medical) qualifies as a reasonable impression of partiality. We disagree. Although we, too, believe that Arbitrator Stein should have disclosed the dispute prior to the commencement of the arbitration proceedings and we understand CD Medical's anger toward Arbitrator Stein for failing to disclose the incident. Nevertheless, we cannot conclude that Arbitrator Stein's failure to disclose the dispute creates a reasonable impression of partiality.

The incident did *not* involve any of the parties to the arbitration hearing. Rather, it involved an attorney who was employed at the same law firm—White & Case—that represented one of the parties—CD Medical. The White & Case attorney involved in the

dispute took no part in the arbitration proceedings. Furthermore, the dispute occurred approximately 18 months prior to the commencement of the arbitration hearing.

With that in mind, it is important to put this incident in perspective. The incident involved an argument between two attorneys over a scheduling dispute. Attorneys argue and disagree with one another all the time. One can debate the professionalism of such behavior, but that will not change the reality of it. True, because Arbitrator Stein memorialized the incident in writing[6] and recalled the dispute some 18 months later, perhaps this was something more than the typical argument between attorneys. Regardless, we cannot conclude that Stein's failure to disclose the incident created a reasonable impression of impartiality.

CD Medical is essentially asking this Court to conclude that because Arbitrator Stein was involved in a dispute with an attorney: (1) whatever animosity or anger he harbored toward that attorney remained 18 months later; (2) the animosity was transferred to the entire firm; and (3) the animosity was ultimately transferred to the White & Case client, CD Medical. That, we cannot conclude. It appears to the Court that this case involves a situation that is more in the line of remote, uncertain, and speculative partiality or a mere appearance of bias or partiality, as opposed to bias or partiality that is direct, definite, and capable of demonstration. *See Int'l Produce, Inc. v. A/S Rosshavet,* 638 F.2d 548, 551 n. 3 (2nd Cir.1981) ("It does not

---

[6]*See* footnote 3, *supra.*

follow that an arbitrator's personal feelings in favor of or against one attorney would necessarily be transferred to another attorney in the same firm."), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981).

CD Medical's *second* argument in support of its claim that Arbitrator Stein was biased is even weaker. Arbitrator Stein became "of counsel" to the law firm of Greenberg Traurig in the middle of 1992. In January of 1990, CD Medical interviewed Greenberg Traurig for the purpose of obtaining representation in the instant dispute. Additionally, in 1988, CD Medical asked Greenberg Traurig to review an amendment to the distributorship agreement between CD Medical and Lifecare.

Because of CD Medical's two contacts with Greenberg Traurig, the firm Arbitrator Stein eventually joined "of counsel," CD Medical asks the Court to conclude that such contacts evidence bias on the part of Arbitrator Stein against CD Medical. We disagree. Once again, we must first put this issue in perspective. At the time of the two contacts, Arbitrator Stein was not even affiliated with Greenberg Traurig. Furthermore, there is no evidence in the record that Arbitrator Stein was even aware of the fact that CD Medical contacted Greenberg Traurig in 1988 or 1990.

Again, we are not condoning Arbitrator Stein's conduct. Indeed, even a rudimentary inquiry by Arbitrator Stein would have likely revealed Greenberg Traurig's prior contacts with CD Medical. However, based on the paltry record before us regarding this particular issue, we cannot conclude that Arbitrator Stein's failure to investigate and, of course, disclose the two prior

contacts between Greenberg Traurig and CD Medical creates a reasonable impression of bias or partiality. Similar to their first argument, it appears CD Medical's position here is based on speculative bias or partiality as opposed to bias or partiality that is direct, definite, and capable of demonstration.

In summary, the "evident partiality" question necessarily entails a fact intensive inquiry. This is one area of the law which is highly dependent on the unique factual settings of each particular case. The black letter rules of law are sparse and analogous case law is difficult to locate. In most cases, the courts have little guidance when confronted with an issue in this area of the law. Based on the facts before this Court, we simply cannot conclude that Arbitrator Stein's conduct, although in violation of Canon II of the American Arbitration Association's Code of Ethics, rises to the level of creating a reasonable impression of bias or partiality.[7]

C. Arbitrary and Capricious

The Eleventh Circuit permits a court to vacate an arbitration award when that award is arbitrary and capricious. *Raiford v. Merrill Lynch, Pierce, Fenner & Smith,* 903 F.2d 1410, 1412 (11th Cir.1990). An award is arbitrary and capricious "only if "a ground for the arbitrator's decision cannot be inferred from the facts of the case.' " *Ainsworth v. Skurnick,* 960 F.2d 939, 941 (11th Cir.1992) (quoting *Raiford,* 903 F.2d at 1413), *cert. denied, ---*

---

[7]In accordance with Canon II of the American Arbitration Association's Code of Ethics, Arbitrator Stein executed a statement verifying that he had "no past or present relationship with the parties or their counsel, direct or indirect, whether financial, professional, social or of any kind."

U.S. ----, 113 S.Ct. 1269, 122 L.Ed.2d 665 (1993). This is, however, a very difficult standard for the party contesting the arbitration award to overcome. Indeed, the award is presumptively correct, *Sullivan, Long & Hagerty, Inc. v. Local 559,* 980 F.2d 1424, 1427 (11th Cir.1993), and will be vacated only if there is no ground whatsoever for the Panel's decision. *Brown,* 994 F.2d at 781. Furthermore, "[f]or an award to be vacated as arbitrary and capricious, the Panel's award must contain more than an error of law or interpretation." *Id.*

With this standard of review in mind, there clearly exists a ground for the Panel's decision.[8] In February of 1988, CD Medical and Lifecare negotiated a settlement agreement by means of an offering and an accepting facsimile.[9] In the offering facsimile, Lifecare, among other things, asked CD Medical to turn over the Algerian market to Lifecare for an additional five-year period. Lifecare also asked CD Medical to provide letters of compliance to reassure or eliminate any potential confusion by the Algerian Government as to who—CD Medical or Lifecare—held the exclusive distributorship rights in Algeria. Finally, Lifecare asked CD Medical to "work with [them] and not against [them]." In return, Lifecare agreed to release CD Medical from any potential liability

---

[8]Here, only the dissenting arbitrator wrote an opinion. The two majority arbitrators did not write an opinion. However, "[i]t is well settled that arbitrators are not required to explain an arbitration award and that their silence cannot be used to infer a grounds for vacating the award." *Robbins,* 954 F.2d at 684.

[9]Although CD Medical will likely disagree with our characterization of their response as an "accepting" facsimile, we refer to it in this fashion merely to highlight a plausible interpretation of the exchange between the parties.

arising from its prior actions regarding the Algerian dispute. In April of 1988, CD Medical, having neglected to send the clarification letters to the Algerian Government, contacted the Algerian Government and informed them that they, not Lifecare, should be Algeria's supplier and distributor.

Thus, certainly the arbitrators could have concluded that a binding agreement was reached between CD Medical and Lifecare in February of 1988 returning Algeria to Lifecare for an additional five-year period. Further, the arbitrators could have concluded that CD Medical breached that agreement by failing to provide the clarification letters and by contacting the Algerian Government and informing them that CD Medical, not Lifecare, should be Algeria's supplier of medical equipment. Accordingly, a rational basis indisputably exists supporting the arbitrator's decision.

In response, CD Medical notes that Lifecare's offering facsimile contained a hand-written provision which intimated the drafting of a formal contract amendment acknowledging the return of Algeria to Lifecare for an additional five years. Further, the last sentence of CD Medical's accepting facsimile provides that "once the amendment and letter have been approved by both of us, we believe that relationships can be better than ever." As a result of these two provisions, CD Medical argues that no binding agreement could have been reached by the parties in February of 1988 until a formal, written amendment to the contract was drafted and signed by the parties. Since there was no formal amendment to the original contract signed by the parties as contemplated by the two facsimiles, CD Medical claims that Algeria was never returned

to Lifecare.

We disagree.

It is true that under Florida law where the parties do not intend to be bound by their agreement (oral or written) until a formal written contract is executed, there is no binding agreement unless and until the written contract is in fact executed. *See Cohen v. Amerifirst Bank,* 537 So.2d 1108, 1110 (Fla. 3rd Dist.Ct.App.1989); *Housing Auth. of Fort Pierce v. Foster,* 237 So.2d 569, 571-72 (Fla. 4th Dist.Ct.App.1970). However, the parties intent, of course, is what ultimately controls. Simply because the parties contemplated the drafting of a subsequent formal, written contract, does not denote that they did not intend to be bound immediately by their oral or written negotiations.[10] *See Citizens Bank of Perry v. Harlie Lynch Constr. Co.,* 426 So.2d 52, 54 n. 2 (Fla. 1st Dist.Ct.App.1983); *Foster,* 237 So.2d at 571-72; *Eastern Air Lines, Inc. v. Mobil Oil Corp.,* 564 F.Supp. 1131, 1145 (S.D.Fla.1983) ("If parties so intend, a contract is binding from the time it is made even though the parties also agree that a formal writing embodying its provisions will subsequently be prepared."), *aff'd,* 735 F.2d 1379 (Temp.Emer.Ct.App.1984).

Here, there was ample evidence produced at the arbitration hearing supporting the conclusion that the parties intended their February 1988 negotiations to be effective immediately, irrespective of the drafting of a formal, written amendment to the original contract. Tony Dow, Lifecare's principal, testified that

---

[10]In this case, the negotiations are of course the offering and accepting facsimiles.

he believed that they had a binding agreement in February of 1988. Additionally, Tommy Brown, an executive of CD Medical, testified that in February of 1988 he was "still operating under the premise that [they] had an agreement." In fact, on February 29, 1988, Mr. Brown sent a telex to the Algerian Government which stated that "it is [CD Medical's] intention to service your account exclusively through Lifecare [ ] for spare parts for the next 5 years." [11] Furthermore, immediately after the February 1988 negotiations, Mr. Dow, with full knowledge of CD Medical, boarded a plane for Algeria for the purpose of negotiating a contract with the Algerian Government.

Thus, once again, certainly the arbitrators could have concluded that a binding agreement existed in February of 1988 between CD Medical and Lifecare, and CD Medical subsequently breached that agreement.[12] As evidenced by the dissenting arbitrator's opinion, one could definitely interpret the evidence in a different light. Indeed, CD Medical's interpretation that no binding contract existed until a formal contract amendment was executed is a viable translation of the evidence. That, however, is not the issue here. Our task is to merely review the arbitration decision and determine whether *any* rational basis exists for the award. In summary, the interpretation of the

---

[11]This telex to the Algerian Government is apparently not the clarification letter that was required to be sent to the Algerian Government pursuant to the February 1988 negotiations.

[12]Since we find that the breach of the February 1988 agreement qualifies as a rational basis supporting the arbitration award, there is no need for us to discuss the alternative grounds offered by Lifecare supporting the arbitration award.

evidence discussed supporting the award is just as feasible as CD Medical's interpretation supporting the overturning of the award. Consequently, we cannot conclude that the arbitration award is arbitrary and capricious.

## IV. CONCLUSION

Since we conclude that the district court's order confirming the arbitration award was not erroneous, we AFFIRM that order.