925 So.2d 1082 (2006)
RDC GOLF OF FLORIDA I, INC., et al., Appellant,
v.
George P. APOSTOLICAS, Appellee.
No. 5D05-2597.
District Court of Appeal of Florida, Fifth District.
March 17, 2006.
Rehearing Denied April 19, 2006.
*1084 Major B. Harding, of Ausley & McMullen, Tallahassee; John M. Brennan and Richard E. Mitchell of GrayRobinson, P.A., Orlando; James E. Cecchi of Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, Roseland, New Jersey, for Appellant.
Michael R. Levin, of Baker & Hostetler, LLP, Orlando, for Appellee.
ORFINGER, J.
RDC seeks review of a final judgment confirming an arbitration award removing it as general partner of Heathrow Golf Company Limited Partnership. RDC alleges the trial court erred by rejecting its claim of evident partiality on the part of one of the arbitrators. We find no error and affirm.
Heathrow Golf is a Florida limited partnership formed to acquire and operate the Heathrow Country Club. George P. Apostolicas and the Schiavone Trust are the limited partners of Heathrow Golf, each owning approximately one-half of the limited partnership interest. RDC was the sole general partner of Heathrow Golf. Pursuant to the parties' agreement, Apostolicas initiated arbitration against RDC, claiming mismanagement of the Heathrow Country Club. RDC and Heathrow counterclaimed, asserting that Apostolicas breached his fiduciary duty to the partnership by misappropriating Heathrow members for a competing golf club he owned. The issues were heard before a panel of three (3) arbitrators, including Chief Arbitrator Jim Grodin, that ultimately issued an arbitration award expelling RDC as the sole general partner of Heathrow.
Apostolicas petitioned to confirm the arbitration award. RDC and Heathrow filed a counter-petition, which sought to vacate the arbitration award, alleging that Chief Arbitrator Grodin was not impartial because he and Apostolicas's counsel, Michael Levin, were, while the arbitration was pending, involved in volunteer work for their synagogue relating to the renewal of the synagogue's contract with its Rabbi. After an evidentiary hearing, the trial court rendered an order confirming the arbitration award, concluding that the relationship between Grodin and Levin was not substantial; that no reasonable person could conclude that the relationship would tend to bias Grodin's judgment; that there was no ex parte communication between Grodin and Levin regarding the subject matter of the arbitration; that the Rabbi's contract transaction was synagogue volunteer work; that Levin's action did not curry favor with Grodin in the arbitration proceeding; and that RDC failed to establish the facts concerning the Rabbi's contract that "might create an impression of possible bias" towards Apostolicas or Levin.
Of particular relevance to our consideration, the trial court made the following relevant findings of fact[1] and conclusions of law:

*1085 6. The case was set for Arbitration before Arbitrators James Grodin, James R. Lussier, and Joseph I. Goldstein. James Grodin was selected as the Chief Arbitrator.
7. On January 13, 2003, Mr. Grodin made the following initial disclosure regarding Apostolicas' counsel, Michael Levin:
I have known Mike Levin for over ten years. He and I have been on opposite sides of a case. He has represented religious organizations on whose board I served where I advocated his retention to represent the organization in litigation matters. His family and mine belong to the same Synagogue, and when I was Synagogue president, his wife served on the Executive Committee and Board over which I presided. I served as the sole arbitrator on a matter in which Mike Levin represented one of the sides.
Neither party objected to Mr. Grodin serving as arbitrator after receiving this disclosure. The parties agreed to Grodin, Lussier, and Goldstein serving on the arbitration panel.
8. Over one year after Mr. Grodin's initial disclosure, the arbitration hearing was held on May 3, 4, 5, 6, 7, 12, 14, and 21, 2004. On the first day of the arbitration hearing, Chief Arbitrator Grodin made the following disclosure:
As I stated off the record, the arbitrators and the attorneys here know each other. And my guess is that we wouldn't have been picked as arbitrators if the attorneys did not know the arbitrators. So long as the litigants understand that, we have no problem proceeding.
No party objected to the panel serving after this disclosure was made.
9. Closing arguments were made on May 21, 2004. After the arbitration hearing concluded and as the participants were exiting the arbitration room towards the elevator, Chief Arbitrator Grodin said to Attorney Levin, "When you review the Rabbi's contract, please look at the footnotes because I may have made a mistake in the footnotes." Attorney Levin apologized that he had not yet had an opportunity to review the contract but told the Chief Arbitrator that he would review the contract on the plane. The court accepts Mr. Grodin's testimony regarding this conversation as credible. This conversation took place publicly between the Chief Arbitrator and Attorney Levin in a manner so that others present could hear them speaking to each other. This was not a secretive conversation "overheard" by Attorney Cecchi.
10. The parties submitted their proposed Memorandum of Arbitration Decision to the Arbitration Panel on June 18, 2004. The panel of arbitrators, Grodin, Lussier, and Goldstein, declared the arbitration hearing closed on July 7, 2004.
11. The panel of arbitrators, Grodin, Lussier, and Goldstein, unanimously issued the Interim Arbitration Award on August 6, 2004. In the Interim Arbitration Award, the panel of three arbitrators, among other things, found that RDC mismanaged Heathrow Golf and that the Heathrow Golf and Country Club suffered from RDC's lack of professional business management. The panel of three arbitrators expelled RDC as the general partner of Heathrow Golf. Apostolicas' claim for damages against RDC was denied. RDC's counterclaim that Apostolicas' development and marketing *1086 of Red Tail Golf and Country Club was a breach of a general fiduciary obligation of loyalty to Heathrow Golf was denied.
12. Three days later, on Monday, August 9, 2004, RDC filed its Petition to Vacate with the court, seeking to have the court vacate the Interim Arbitration Award that was issued in favor of Apostolicas.
13. RDC's Petition to Vacate raised the following objections to the Interim Arbitration Award in favor of Apostolicas: The arbitrators exceeded their powers and the Chief Arbitrator demonstrated evident partiality.
14. Regarding Chief Arbitrator Grodin's relationship with Attorney Levin, the Petition to Vacate, in relevant part, states as follows:
Upon information, the Chief Arbitrator, James Grodin, has a professional relationship with Apostolicas' counsel, Michael Levin that was not properly disclosed to RDC or its Counsel. During the hearing, RDC overheard conversations suggesting that the Messrs. Grodin and Levin either represented the same person recently, or were working together on the same matter involving a Rabbi and Synagogue at the very same time the arbitration was pending. This relationship was never disclosed.
15. The conversation referenced in the Petition to Vacate between Chief Arbitrator Grodin and Attorney Levin was heard by RDC's counsel, James E. Cecchi, on May 21, 2004. Attorney Cecchi heard this conversation and took no action regarding the conversation until after RDC received the adverse award on August 6, 2004.
16. On August 11, 2004, RDC's counsel wrote to the AAA and provided the AAA with a copy of the Petition to Vacate filed on August 9, 2004, in circuit court and requested a full disclosure by Chief Arbitrator Grodin of his entire relationship with Attorney Levin.
17. On August 27, 2004, the parties received Chief Arbitrator Grodin's supplemental disclosure which stated, in relevant part, as follows:
I drafted our Rabbi's employment contract for a Synagogue committee, which is negotiating it with Mr. Levin who serves as the Rabbi's representative. I advised the committee at the outset that I would not and could not have any contact with Mr. Levin on this matter.
....
37. Because there are no allegations of actual conflict or bias in this case, to vacate an arbitration award on the theory that undisclosed facts establish "evident partiality," RDC must show that the undisclosed circumstances would reasonably tend to bias the judgment of Chief Arbitrator Grodin. See Deen v. Oster, supra; Boyhan v. Maguire, supra. In this case, the undisclosed facts do not show circumstances which would reasonably tend to bias the judgment of Chief Arbitrator Grodin in favor of Michael Levin or his client, Apostolicas.
38. On January 31, 2003, Mr. Grodin made his initial disclosure that he and Attorney Levin were members of the same Synagogue. Approximately one year later, unbeknown to RDC, Messrs. Grodin and Levin's Synagogue, the COS [Congregation Ohev Shalom], decided to renew its engagement contract with its Rabbi. In February of 2004, the Executive Board of COS held a meeting and appointed Bill Sholk and Jim Grodin to negotiate the Rabbi's new employment contract.[FN] Bill Sholk was present at this meeting. Jim Grodin was not. When Bill Sholk called Jim Grodin about *1087 the Rabbi's new contract, Jim Grodin told Bill Sholk that he would not work with Michael Levin because of this pending arbitration and that Bill Sholk would have to negotiate the contract for the Synagogue. It is clear from the evidence that Bill Sholk agreed to negotiate the turns of the contract for the Synagogue and that Jim Grodin agreed to draft the contract.
[FN] The Rabbi has an existing four year employment contract with COS that ends in August of 2005. Jim Grodin drafted this contract and the Rabbi's earlier contract with COS dating back to 1995. COS wanted to negotiate a new contract with the Rabbi before the existing contract expired.
39. The Court accepts the testimony of Bill Sholk as credible. The term sheets for the Rabbi's contract were negotiated by Bill Sholk and Michael Levin from March to April of 2004. Bill Sholk was not set up as a "Middle-man," as argued by RDC but, in fact, served as the negotiator on behalf of the Synagogue. Jim Grodin provided legal counsel to Bill Sholk and drafted the Rabbi's contract on behalf of the Synagogue. Jim Grodin prepared all of the drafts of the Rabbi's contract.
40. Jim Grodin was not a decisionmaker with respect to the Rabbi's new contract. The congregation and Executive Board of COS and the Rabbi were the decision-makers.
41. It is uncontroverted that by April 18, 2004, Bill Sholk and Michael Levin reached complete agreement on all issues regarding the Rabbi's new 15 year ... contract. On April 18, 2004, the renewal of the Rabbi's contract was taken before the COS at its Annual Meeting and the congregation voted to renew the Rabbi's contract for 15 years..., with the terms as negotiated by Bill Sholk and Michael Levin. The same evening as the COS Annual Meeting, the Executive Board of the COS met and also approved the 15 year ... contract as presented. After the April 18th meetings, when the business deal was negotiated and agreed upon by the Rabbi, the COS, the COS's Executive Board, the new contract terms were sent by Bill Sholk to Jim Grodin for Jim Grodin to "plug in terms."
42. The first draft of the Rabbi's contract as prepared by Jim Grodin was e-mailed to Bill Sholk on April 27, 2004. This draft was forwarded by Bill Sholk to Michael Levin on April 29, 2004. The April 27th contract was complete and included all of the negotiated terms. On April 27, Bill Sholk e-mailed Michael Levin and told him that this contract was going to be taken to the Board on April 28th at a special meeting for the sole purpose of the congregation formally agreeing on the contract. Bill Sholk ended this e-mail to Michael Levin by stating as follows, "We will get the blessing tomorrow night and after you look at and approve the contract, both sides can sign and put this to bed."
43. The arbitration hearing in this case began several days later on May 3, 2004, and concluded on May 21, 2004. It was on May 21, 2004, at the end of the arbitration hearing as everyone was leaving that Chief Arbitrator Jim Grodin generally said to Michael Levin in the presence of, at least, Attorney Cecchi, "When you review the Rabbi's contract, please look at the footnotes because I may have made a mistake in the footnotes." Michael Levin apologized that he had not yet had an opportunity to review the contract, but told the Chief Arbitrator he would review the contract on the plane.

*1088 44. On June 11, 2004, Michael Levin began contract negotiations again by raising severance and disability issues. Disability became a contentious issue between Bill Sholk and Michael Levin for two reasons: (1) Bill Sholk thought Michael Levin was trying to change their previous agreement which had already been voted on and approved by the COS and (2) Bill Sholk was irritated by Michael Levin's strident and "obnoxious" e-mails. The e-mails produced by Jim Grodin reveal that Jim Grodin and Michael Levin were directly and indirectly receiving and sending e-mails regarding the Rabbi's employment from June 11th to June 18th and from July 2nd to July 8th. The direct e-mails between Jim Grodin and Michael Levin occurred because Bill Sholk and Michael Levin began "sparking" with each other.
....
46. On June 16, 2004, Jim Grodin called Michael Levin on the telephone to tell him to "cut the crap," come up with a new suggestion and that the contract was going nowhere, that he needed to be positive, and to explain to Michael Levin the history behind the language in an earlier rabbi's contract with COS. The court accepts Jim Grodin's testimony regarding this telephone conversation with Michael Levin as credible. Jim Grodin and Michael Levin did not discuss the substantive terms of the current Rabbi's contract renewal during this telephone call. The evidence establishes that Jim Grodin and Michael Levin did not discuss the pending arbitration during this telephone call.
47. On June 18, 2004, the parties submitted their proposed Memorandum of Arbitration Decision to the Arbitration Panel.
48. From July 2 through July 8, 2004, the disability and severance issues were resolved. Severance was not a contentious issue and was not included in the Rabbi's contract. Disability was a contentious issue between Bill Sholk and Michael Levin. Bill Sholk sought counsel from Jim Grodin on how to deal with Michael Levin during this time frame. Ultimately, Bill Sholk and Michael Levin reached agreement on the disability issue on July 8, 2004.
49. On July 7, 2004, the Arbitration Panel declared the arbitration closed.
50. From July 8, 2004, until August 9, 2004, Michael Levin had no contact with anyone regarding the Rabbi's contract, except the Rabbi.
51. On August 6, 2004, the three-member Arbitration Panel issued the Interim Arbitration Award.
....
56. Florida requires that "evident partiality" be found only where a reasonable person would conclude that the undisclosed circumstances would tend to bias the judgment of a neutral arbitrator. The alleged partiality must be direct, definite, and capable of demonstration rather than remote, uncertain, and speculative. A reasonable person looking at the undisclosed circumstances in the instant case would conclude that Jim Grodin's involvement with the renewal of the Rabbi's engagement contract and relationship with Michael Levin would not "tend to bias his judgment" in the arbitration proceeding.
57. RDC argues that Jim Grodin's undisclosed involvement with the Rabbi's engagement contract renewal requires vacatur because it was: (a) concurrent with the arbitration; (b) fraught with numerous opportunities for ex-parte contact and favoritism; and (c) material as to time, value and relationship.

*1089 58. The Rabbi's contract renewal did occur during the parties' arbitration proceeding. The Rabbi's contract renewal began in early 2004 and ended on September 9, 2004, when the Synagogue and Rabbi signed the new engagement contract. The parties' arbitration began on October 2, 2002, and ended with the rendition of the Final Arbitration Award on October 25, 2004. Clearly, the undisclosed relationship between Jim Grodin and Michael Levin occurred during the arbitration proceedings, including the arbitration hearing, deliberation and rendition of the Arbitration Award.
59. While Jim Grodin's undisclosed relationship with Michael Levin was concurrent with the arbitration proceedings, this relationship was not a substantial relationship. There were no ex-parte communication between Jim Grodin and Michael Levin regarding the subject matter of the arbitration proceeding. The arbitration was mentioned in the Rabbi's contract renewal one time in an e-mail from Michael Levin to Bill Sholk dated June 11, 2004 which stated, in relevant part, as follows: "I have been immersed in an arbitration immediately followed by a family trip to England ... Because of the delay and the possibility that you are now on vacation, I am taking the liberty of forwarding this draft to Burt Chasnov, Jim Grodin and Jeff Bornstein, all of whom I understand to be involved on your side of the negotiations." This e-mail was also copied to Burt Chasnov, Jim Grodin and Jeff Bornstein by Michael Levin. The arbitration was also mentioned by Jim Grodin to Bill Sholk at the beginning of the contract renewal process as the reason that Jim Grodin would not negotiate the Rabbi's new contract with Michael Levin.
60. RDC correctly argues that the Rabbi's contract that was renewed for 15 years ... was a material contract. While this clearly was a material contract for the COS and the Rabbi, this material contract did not create a substantial relationship between Jim Grodin and Michael Levin. Both attorneys were volunteering their time and their talents to help their Synagogue renew its contract with its Rabbi. Jim Grodin already had previous COS engagement contracts on his computer because he had produced several other employment contracts on behalf of the COS for this Rabbi and other rabbis and cantors.
61. By the time Jim Grodin became involved with the instant contract renewal, both the congregation of COS and its Executive Board had already voted to approve a 15 year ... engagement contract for its Rabbi and these material terms were never an issue. While the disability issue was also a material issue, a contentious issue and an issue with which Jim Grodin had some involvement, it is uncontroverted that the disability issue could not have been a deal breaker. Bill Sholk testified that the Rabbi was staying, that one item would not be a deal breaker, and that they just needed to reach an agreement. The court accepts this testimony as credible and assigns little weight to the fact that the disability issue became a contentious issue for a period of time during the June 11th-18th and July 2nd-8th negotiations and to the fact that Jim Grodin had some involvement with the disability issue or any of the contract issues. The Rabbi's written engagement contract was going to be finalized, it was just a matter of when. The COS had already voted to keep their Rabbi for fifteen years, until the Rabbi retired. The length and salary had already been agreed upon by both the COS and the Rabbi. The terms of the contract, even *1090 material ones, were going to be worked out because the congregation wanted this Rabbi as their Rabbi until he retired. This was volunteer Synagogue work and Jim Grodin wanted to expeditiously finalize the Rabbi's new engagement contract.
62. Michael Levin did not do anything in the Rabbi's contract renewal that curried favor with Jim Grodin in the arbitration proceeding: There were no real life opportunities for a "quid pro quo" created by the undisclosed circumstances in this case. The "Thanks Mike" e-mail from Jim Grodin to Michael Levin on June 16, 2004, for making a different proposal on the disability issue proposal is not evidence that Michael Levin had curried favor with Jim Grodin in the arbitration proceeding. A review of Jim Grodin's relationship with Michael Levin in the Rabbi's contract renewal would not lead a reasonable person to believe that a potential conflict exists in the arbitration proceeding.
63. RDC argues that former Chief Arbitrator Grodin's nondisclosure was designed to conceal his relationship with Attorney Levin. The court disagrees. The court notes that Jim Grodin made a general disclosure that he and Michael Levin were members of the same Synagogue. There is no evidence to establish that the Chief Arbitrator's non-disclosure in this case was calculated to conceal his involvement in the Rabbi's contract renewal. The court bases this conclusion in part on the fact that Chief Arbitrator Grodin spoke openly to Attorney Levin in front of, at least, Attorney Cecchi about the Rabbi's contract renewal. This is not conduct consistent with a plan to conceal Jim Grodin's involvement with the Rabbi's contract renewal. The court concludes from all the evidence that former Chief Arbitrator Grodin did not disclose his involvement in the Rabbi's contract renewal because he thought his involvement was trivial.
64. A reasonable person, considering all the undisclosed evidence in this case, would not conclude that Jim Grodin's involvement with Michael Levin in the Rabbi's contract renewal would tend to bias his judgment in favor of Apostolicas or Michael Levin in the arbitration proceeding. RDC has not established that the undisclosed facts in this case "might create an impression of possible bias" towards Apostolicas or Michael Levin in the arbitration proceeding. There is no "evident partiality" in this case.
65. The evidence establishes that Chief Arbitrator Grodin drafted the Rabbi's contract on behalf of the Synagogue and served as the attorney for the Synagogue and that Bill Sholk negotiated the terms of the contract on behalf of the Synagogue. Michael Levin represented the Rabbi in the contract negotiations. The drafting and negotiation of the Rabbi's contract occurred concurrent with the arbitration proceedings, including the arbitration hearing and deliberations. RDC was unaware of the roles Messrs. Grodin and Levin played in the renewal of the Rabbi's contract until RDC filed its Petition to Vacate the Interim Arbitration Award.
....
67. The court concludes that Chief Arbitrator Grodin should have fully disclosed his involvement with Michael Levin in the renewal of the Rabbi's engagement contract. The Chief Arbitrator did not do so in a timely manner during the arbitration proceeding.
68. As stated by the Fourth District in Weinger v. State Farm Fire & Casualty, 620 So.2d 1298, 1299 (Fla. 4th DCA 1993), "It is now clear that an arbitrator has an affirmative duty to disclose any *1091 dealings that might create an impression of possible bias." The Weinger court continued, "Failure to disclose such an association undermines the appearance of propriety and the confidence of the fairness of the proceedings and requires the vacation of the award." Id. [sic]. While the undisclosed circumstances in this case do not rise to the level of "might create an impression of possible bias," Chief Arbitrator Grodin should have fully disclosed them anyways [sic]. For the reasons stated in this order, former Chief Arbitrator Grodin's nondisclosure does not warrant vacating the Final Arbitration Award.
(Most internal footnotes omitted).

DISCUSSION
RDC argues that it did not have the benefit of an impartial arbitration panel because during critical phases of the arbitration proceeding, Chief Arbitrator Grodin and Apostolicas's counsel, Levin, were both involved in a material contract transaction. RDC claims that Grodin and Levin failed to disclose, actively concealed, and then misrepresented the existence and extent of their relationship with respect to the contract transaction. RDC further asserts that this relationship "might create an impression of possible bias" to a reasonable party in the position of RDC and Heathrow, and, consequently, the arbitration award should be vacated.

STANDARD OF REVIEW
A high degree of conclusiveness attaches to an arbitration award. Deen v. Oster, 814 So.2d 1065, 1068 (Fla. 4th DCA 2001); see Charbonneau v. Morse Operations, Inc., 727 So.2d 1017, 1019 (Fla. 4th DCA 1999). To vacate an arbitration award, a party must establish one of the five statutory grounds set forth in section 682.13(1)(a)-(e), Florida Statutes (2004). See Commc'ns Workers of Am. v. Indian River County Sch. Bd., 888 So.2d 96, 99 (Fla. 4th DCA 2004). When the party moving to vacate fails to prove one of the five statutory grounds, "neither a circuit court nor a district court of appeal has the authority to overturn the award." Schnurmacher Holding, Inc. v. Noriega, 542 So.2d 1327, 1328 (Fla.1989). Appellate review of orders granting or denying a motion to vacate an arbitration award are governed by "the same standards as in any ordinary case, whereby findings of fact are reviewed under a competent and substantial evidence standard and legal questions are reviewed de novo." See Boyhan v. Maguire, 693 So.2d 659, 662 (Fla. 4th DCA 1997); see also Noriega (explaining that in reviewing an arbitration award, the reviewing court may not comb the record of the arbitration hearing for errors of fact or law inherent in the decision-making process).

EVIDENT PARTIALITY
Both Florida and federal law hold that evident partiality is a basis to vacate an arbitration award. § 682.13(1)(b), Fla. Stat. (2004); 9 U.S.C. § 10(a)(2). Because Florida's arbitration statute is modeled after the Federal Arbitration Act, federal decisions are highly persuasive. See Seretta Constr., Inc. v. Great Am. Ins. Co., 869 So.2d 676, 679 (Fla. 5th DCA 2004). However, while decisions of federal courts are persuasive, we are bound only by decisions of the United States Supreme Court. See Mora v. Abraham Chevrolet-Tampa, Inc., 913 So.2d 32, 35 (Fla. 2d DCA 2005); Raymond James Fin. Servs., Inc. v. Saldukas, 851 So.2d 853, 856 (Fla. 2d DCA 2003).
Here, the trial court determined that Grodin should have fully disclosed his involvement with Levin in the contract proceedings. Nevertheless, the trial court confirmed the arbitration award based on its conclusion that the undisclosed circumstances *1092 did not create an impression of possible bias. RDC argues that the trial court applied the wrong legal standard, erroneously relying on Lifecare International, Inc. v. CD Medical, Inc., 68 F.3d 429, 432 (11th Cir.1995), which held that the "mere appearance of bias or partiality is not enough to set aside an arbitration award." RDC contends that the standard established in Lifecare conflicts with the more recent Eleventh Circuit case of University Commons-Urbana Ltd. v. Universal Constructors, Inc., 304 F.3d 1331, 1339 (11th Cir.2002), as well as Florida law set forth in Weinger v. State Farm Fire & Casualty Co., 620 So.2d 1298, 1299 (Fla. 4th DCA 1993).

A. Florida Law

Section 682.13(1)(b), Florida Statutes (2004), provides that a "court shall vacate an award when ..." "`[t]here was evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators or umpire or misconduct prejudicing the rights of any party.'" Deen, 814 So.2d at 1068; see Int'l Ins. Co. v. Schrager, 593 So.2d 1196, 1197 (Fla. 4th DCA 1992); see also Weinger, 620 So.2d at 1299 (holding that in arbitration cases, "it is clear that an arbitrator has an affirmative duty to disclose any dealings that might create an impression of possible bias"). However, an arbitration award may only be set aside upon the "showing of circumstances which would reasonably tend to bias the judgment of an impartial arbitrator." Boyhan, 693 So.2d at 662.

B. Federal Law

The Federal Arbitration Act likewise authorizes the court to vacate an arbitration award "where there was evident partiality... in the arbitrators, or either of them." 9 U.S.C. § 10(a)(2). However, "evident partiality, like obscenity, is an elusive concept: one knows it when one sees it, but it is awfully difficult to define in exact terms. No jurist has yet coined an exacting legal standard for `evident partiality,' although many have tried." Cont'l Ins. Co. v. Williams, No. 84-2646-CIV-MARCUS, 1986 WL 20915, *3-4 (S.D.Fla. Sept.17, 1986) (citations omitted). The definitional difficulties of "evident partiality" notwithstanding, it is settled that the evident partiality inquiry is a case-specific and fact-intensive one. See Lifecare, 68 F.3d at 435 (stating that the question of evident partiality is "fact intensive" and "highly dependant on the unique factual settings of each particular case").
The leading United States Supreme Court case concerning claims of arbitral evident partiality is Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968). Thus, any inquiry must begin there. In Commonwealth Coatings, the United States Supreme Court addressed the circumstances under which 9 U.S.C. § 10(a)(2) authorizes the vacation of an arbitration award for failure to disclose the existence of a close financial relationship between a neutral arbitrator and a party to the arbitration. 393 U.S. at 146-48, 89 S.Ct. 337. In that case, one arbitrator of a three-arbitrator panel failed to inform the plaintiff that the defendant had been a sporadic customer of the arbitrator's business, and that the relationship went so far as to include the rendering of services on the very projects involved in the arbitration. After the arbitration panel made a unanimous decision in favor of the defendant, the plaintiff learned of the business relationship between the arbitrator and the defendant and challenged the award on the basis that the arbitrator's failure to disclose his prior business relationship resulted in "evident partiality," thereby, warranting a vacation of the award. The Supreme Court held that the *1093 arbitrator's failure to disclose these facts justified vacation of the arbitration award, noting that it is not only actual bias, but the appearance of bias that must be excluded from judicial and arbitral forums. Id. at 146-50, 89 S.Ct. 337.
In delivering the Court's opinion[2] in Commonwealth Coatings, Justice Black wrote:
It is true that arbitrators cannot sever all their ties with the business world, since they are not expected to get all their income from their work deciding cases, but we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review. We can perceive no way in which the effectiveness of the arbitration process will be hampered by the single requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias.

Id. at 149-50, 89 S.Ct. 337 (emphasis supplied). To us, it appears that the Supreme Court in Commonwealth Coatings envisioned that an arbitrator's award could be challenged on the basis of bias, when the challenging party presented facts that, viewed reasonably, gave rise to an "impression of possible bias." 393 U.S. at 149-50, 89 S.Ct. 337.
Following Commonwealth Coatings, the interpretation of what has come to be referred to as the "reasonable impression of partiality" standard has varied somewhat among the different federal courts considering it.[3] The Eleventh Circuit has said that an arbitration award may be vacated due to the "evident partiality" of an arbitrator only when either (1) an actual conflict exists, or (2) the arbitrator knows of, but fails to disclose, information that would lead a reasonable person to believe that a potential conflict exists. Univ. Commons-Urbana Ltd., 304 F.3d at 1339; Middlesex Mut. Ins. Co., 675 F.2d 1197, 1202 (11th Cir.1982). The party challenging the arbitration award must demonstrate that the undisclosed information creates a "reasonable impression of partiality," Lifecare, 68 F.3d at 433 (citation omitted), or put another way, "information which would lead a reasonable person to believe that a potential conflict exists." Gianelli Money Purchase Plan & Trust v. ADM Investor Servs., Inc., 146 F.3d 1309, 1312 (11th Cir. *1094 1998). The alleged partiality must be "direct, definite and capable of demonstration rather than remote, uncertain, and speculative." Id.; see Scott v. Prudential Sec., Inc., 141 F.3d 1007, 1015 (11th Cir. 1998) (holding that "to vacate an arbitration award for evident partiality, the moving party must present evidence that would support a `reasonable impression of partiality' on the arbitrator's behalf ... [t]he assertion of partiality, however, must be `direct, definite and capable of demonstration rather than remote, uncertain and speculative'").[4] Whether these conditions have been met ordinarily requires a fact-intensive inquiry. Lifecare, 68 F.3d at 435. In general, "the mere appearance of bias or partiality is not enough to set aside an arbitration award." Id. at 433 (citing Consol. Coal Co. v. Local 1643, United Mine Workers of Am., 48 F.3d 125, 129 (4th Cir.1995)). If, however, the moving party can show that an arbitrator failed to disclose a substantial relationship between himself and a party, then the less demanding "appearance of bias" standard applies. Park v. First Union Brokerage Servs., Inc., 926 F.Supp. 1085, 1088 (M.D.Fla.1996) (citing Commonwealth Coatings, 393 U.S. at 151-52, 89 S.Ct. 337 (White, J., concurring)).
Other courts have reached similar conclusions, i.e., that the party challenging the arbitration award is required to present admissible, credible evidence that created an impression of bias that is direct, definite, and capable of demonstration, rather than a mere appearance of a remote, uncertain, and speculative bias. See, e.g., Nationwide Mut. Ins. Co. v. Home Ins. Co., 278 F.3d 621, 626 (6th Cir.2002) ("The alleged partiality must be direct, definite, and capable of demonstration, and the party asserting evident partiality must establish specific facts that indicate improper motives on the part of the arbitrator."); Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co., 991 F.2d 141, 146 (4th Cir. 1993) (stating that the alleged partiality must be direct, definite, and capable of demonstration rather than remote, uncertain, and speculative); Employers Ins. of Wausau v. Nat'l Union Fire Ins. Co. of Pittsburgh, 933 F.2d 1481, 1489 (9th Cir. 1991) (a party "must demonstrate more than a mere appearance of bias to disqualify an arbitrator"); Washburn v. McManus, 895 F.Supp. 392, 398 (D.Conn. 1994) (stating that there must be more than mere appearance of bias to vacate arbitrator's award); Health Servs. Mgmt. Corp. v. Hughes, 975 F.2d 1253, 1264 (7th Cir.1992) (determining that evident partiality within the meaning of subsection (a) of the FAA means more than the mere appearance of bias; to set aside an award for arbitration partiality, the interest or bias must be direct, definite, and capable of demonstration rather than remote, uncertain, or speculative); Waverlee Homes, Inc. v. McMichael, 855 So.2d 493 (Ala. 2003) (holding that under "reasonable impression of partiality standard," party challenging arbitration award was required to present admissible, credible evidence *1095 that created an impression of bias that is direct, definite, and capable of demonstration, rather than a mere appearance of a remote, uncertain, and speculative bias); see also Consol. Coal Co., 48 F.3d at 129 (determining that to demonstrate evident partiality under the FAA, the party seeking vacation has burden of proving that a reasonable person would have to conclude that the arbitrator was partial to the other party to the arbitration, and the reasonable person standard requires a showing of more than the appearance of bias); Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds, 748 F.2d 79, 84 (2d Cir.1984) (holding that "`evident partiality' within the meaning of 9 U.S.C. § 10 will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration"); Metro. Prop. & Cas. Ins. Co. v. J.C. Penney Cas. Ins. Co., 780 F.Supp. 885, 891 (D.Conn.1991) (stating that the party alleging impropriety "must establish facts that create a reasonable impression of bias or misconduct") (citations omitted).
We conclude that the weight of authority developed after Commonwealth Coatings requires a review of the evidence utilizing the "reasonable impression of partiality" standard. As such, we find that the trial court properly weighed RDC's allegations of Grodin's evident partiality by considering whether RDC made a showing through credible evidence, giving rise to a "reasonable impression of partiality" that was "direct, definite, and capable of demonstration," as distinct from a "mere appearance" of bias that was remote, uncertain, and speculative.

C. Application of the Prevailing Law

Commonwealth Coatings does not establish a per se rule requiring vacatur of an award whenever an undisclosed relationship is discovered. See Lucent Techs. Inc. v. Tatung Co., 379 F.3d 24, 30 (2d Cir.2004).[5] Instead, only dealings that "might create an impression of possible bias" must be disclosed. Lifecare, 68 F.3d at 433; Weinger, 620 So.2d at 1299. This does not require arbitrators to provide the parties with a "complete and unexpurgated business biography." Commonwealth Coatings, 393 U.S. at 151, 89 S.Ct. 337 (White, J., concurring). "Whether ties are so indirect or remote that they could not reasonably create an impression of bias is a question that must be answered by reference to the facts of the particular case." Sanko S.S. Co. v. Cook Indus., Inc., 495 F.2d 1260, 1264 n. 3 (2d Cir.1973).
As the trial court determined, Grodin should have disclosed his involvement with Levin in the renewal of the Rabbi's employment contract. Nevertheless, as the trial court found, it does not appear that Grodin's non-disclosure created a reasonable impression of partiality, thereby, warranting the vacation of the *1096 final arbitration award. There was no evidence that Levin did, or could have done anything in the negotiations of the Rabbi's contract renewal to curry favor with Grodin in the arbitration proceedings, or that Grodin's contact with Levin regarding the Rabbi's contract renewal was substantial. Although Grodin and Levin's relationship did exist at the same time as the arbitration proceeding, Grodin had no financial interest in the Rabbi's contract. The trial court's findings, supported by substantial, competent evidence, establish that the Rabbi's contract was substantially negotiated between Levin and Bill Sholk between February 2004 and April 2004, before the arbitration was heard. While the disability issue arose during the course of the arbitration proceedings, it was not an essential term, and it was only on this issue that there was any contact between Grodin and Levin. This limited contact falls short of evidence demonstrating that Levin curried favor with Grodin in the arbitration proceeding.
Further, contrary to RDC's assertion, it does not appear that Grodin's non-disclosure was designed to conceal his relationship with Levin. Grodin made a general disclosure that he and Levin were members of the same synagogue. Grodin also spoke openly to Levin about the Rabbi's contract renewal in the presence of RDC's attorney. As the trial court concluded, this is not conduct that is consistent with a plan to conceal.
Here, RDC asks this Court to conclude that because Grodin failed to disclose his involvement with Levin in the renewal of the Rabbi's employment contract, the arbitration award should be vacated. We cannot reach that conclusion. The facts of this case do not show bias or partiality that is direct, definite, and capable of demonstration. Lifecare, 68 F.3d at 433; see Local 530, AFSCME, Council 15 v. City of New Haven, 9 Conn.App. 260, 518 A.2d 941, 947 (1986) (holding that even under the "appearance of bias" standard, that appearance must be reasonable; "[t]he mere speculative statement of bias by a participant in the arbitration proceeding does not in and of itself justify a claim of disqualification").
Because we conclude that the trial judge's findings of fact are supported by competent, substantial evidence, and that the correct rule of law was applied, we affirm.
AFFIRMED.
GRIFFIN and THOMPSON, JJ., concur.
NOTES
[1] RDC does not challenge the findings of fact. It does, however, challenge the application of the facts to the law.
[2] Whether Commonwealth Coatings is a plurality opinion or a majority opinion is an open question. Most courts, including the Eleventh Circuit, have concluded that Commonwealth Coatings is a plurality opinion. See, e.g., Middlesex Mut. Ins. Co. v. Levine, 675 F.2d 1197 (11th Cir.1982); Nationwide Mut. Ins. Co. v. Home Ins. Co., 429 F.3d 640 (6th Cir.2005); Apperson v. Fleet Carrier Corp., 879 F.2d 1344, 1358 n. 19 (6th Cir.1989); Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 681-82 (7th Cir.1983); Austin South I, Ltd. v. Barton-Malow Co., 799 F.Supp. 1135, 1141 (M.D.Fla.1992) (stating that Commonwealth Coatings is a plurality opinion, and, therefore, the Court's holding may be viewed as that position taken by those members who concurred in the judgments on the narrowest grounds). Other courts have found to the contrary. See, e.g., Positive Software Solutions, Inc. v. New Century Mortg. Corp., 436 F.3d 495 (5th Cir.2006); Schmitz v. Zilveti, 20 F.3d 1043, 1045 (9th Cir.1994) (stating that Commonwealth Coatings is not a plurality opinion because Justice White joined in the majority opinion although he wrote "additional remarks").
[3] Several courts have remarked on the muddled state of the law concerning evident partiality, due in part to this decision. See Morelite Constr. Corp., 748 F.2d at 82-84; Merit Ins. Co., 714 F.2d at 681-82; see also Burlington N. R.R. v. TUCO, 960 S.W.2d 629, 634 (Tex.1997) (commenting on the two conflicting standards that the federal courts have adopted in wake of Commonwealth Coatings).
[4] The burden of proof with regard to claims of evident partiality and arbitrator misconduct or misbehavior prejudicing the rights of a party rests with the party raising such allegations. That burden is substantial, extending beyond the mere appearance of impropriety to something approximating clear and convincing evidence of material wrongdoing. Thus, in the absence of substantial, direct proof that one or more of the types of misconduct addressed in section 10(a)(2) of the Federal Arbitration Act has transpired, coupled with a demonstrated link between that the untoward behavior and the challenged arbitral result, the prospects for the vacation of the arbitration award are doubtful. Stephen L. Hayford, Law in Disarray: Judicial Standards for Vacatur of Commercial Arbitration Awards, 30 GALR 731, 748-49 (1996) (internal citations omitted).
[5] RDC relies on cases from other jurisdictions that contravene the rule adopted in Florida and the Eleventh Circuit. See, e.g., Henry v. Halliburton Energy Servs., 100 S.W.3d 505, 509 (Tex.App.2003) (finding that the evident partiality is established from the nondisclosure itself, regardless of whether the nondisclosed information necessarily establishes partiality or bias); Valrose Maui, Inc. v. Maclyn Morris, Inc., 105 F.Supp.2d 1118 (D.Hawai'i 2000) (concluding that the mere appearance of bias created by even good faith ex parte communications was sufficient to show "evident partiality"); Kern v. 303 East 57th Street Corp., 204 A.D.2d 152, 611 N.Y.S.2d 547 (1994) (holding that the appearance of impropriety or partiality is sufficient to warrant vacature of an arbitration award; it is only necessary to demonstrate the potential for bias to find misconduct). Because these cases are not consistent with the standard articulated by Florida courts and the Eleventh Circuit, they are not controlling.