A06A2339. DEPARTMENT OF COMMUNITY HEALTH et al. v. PRUITT CORPORATION et al.

(673 SE2d 36)

JOHNSON, Presiding Judge.

This Medicaid reimbursement case is before us for a second time. The appeal began when the Georgia Department of Community Health challenged a superior court ruling that reversed the department's calculation of Medicaid reimbursement rates for a nursing facility owned by Pruitt Corporation.[1] We reversed the superior court's judgment on appeal, but the Supreme Court found fault with our standard of review and remanded the case to us for further consideration.[2] We have now conducted the appropriate review, and we affirm the superior court ruling.

Although our prior opinion sets forth the facts in detail, we will repeat the relevant facts here for ease of discussion. In order to participate in the state Medicaid program, a nursing facility must

---

[5] (Citation and punctuation omitted.) *Canziani v. Visiting Nurse Health Systems*, 271 Ga. App. 677, 679 (1) (610 SE2d 660) (2005).

[6] Id.

[7] *Ashman v. Marshall's of MA*, 244 Ga. App. 228, 230 (1) (535 SE2d 265) (2000).

[1] *Dept. of Community Health v. Pruitt Corp.*, 284 Ga. App. 888 (645 SE2d 13) (2007) (*"Pruitt I"*), vacated by *Pruitt Corp. v. Ga. Dept. of Community Health*, 284 Ga. 158 (664 SE2d 223) (2008) (*"Pruitt II"*).

[2] Id.; *Pruitt II*, supra at 158.

enter into an agreement with the department. That agreement incorporates by reference the department's nursing facility policies and procedures manual, which sets forth the methodology for calculating Medicaid reimbursement rates.

Pursuant to the manual, the department establishes a facility-specific "per diem" Medicaid reimbursement rate for each nursing facility based on revenues, expenses, and statistical data reflected in a facility's "cost report." Nursing facilities must submit an annual cost report by September 30 for each fiscal year ending June 30. The department then audits the report and establishes a new per diem rate for the facility for the following fiscal year. When a nursing facility changes ownership, the department requires both the buyer and the seller to submit a cost report for the respective period of time that it operated the facility.

Old Capital Inn is a Medicaid-reimbursed nursing facility that has a reimbursement agreement with the department. On May 1, 2002, Pruitt acquired Old Capital Inn from Integrated Health Services (IHS). After the sale, IHS submitted to the department a ten-month cost report for the period of July 1, 2001 through April 30, 2002, and Pruitt submitted a two-month cost report based on the May 1, 2002 through June 30, 2002 period.

As quoted in our prior opinion, the department's policy manual sets forth the following guidelines for determining reimbursement rates when a nursing facility changes ownership:

> If the new owner's initial cost report contains less than six months worth of patient day data, when the initial cost report periods are used to set rates, the new owner will receive a rate based on the previous owner's last approved cost report inflated to current costs, as determined by the [department], or the costs from the new owner's initial cost report, whichever is lower.

The phrase "previous owner's last approved cost report" is not defined in the manual.

Pruitt's two-month cost report for the fiscal year ending June 30, 2002 yielded a per diem cost of $109.66. The per diem cost based on IHS's ten-month report for the period ending April 30, 2002 would have been $98.94. In setting the final reimbursement rate for 2004, however, the department did not refer to this ten-month report. Instead, it compared the $109.66 per diem cost from Pruitt's two-month 2002 report to the per diem cost from IHS's *2001* cost report, adjusted for inflation, or $93.07. Selecting the lower of these

two amounts, it set Old Capital Inn's 2004 per diem reimbursement rate at $93.07.[3]

To reach this result, the department interpreted the phrase "last approved cost report" to mean the most recent report to have met all conditions for serving as the basis for a per diem rate. And according to the department, a report cannot be used to calculate a rate unless it is accepted, audited, and has a June 30 end-date. The department thus rejected the ten-month 2002 cost report, which was not audited and ended in April, and used IHS's report from fiscal year 2001.

Objecting to the department's reliance on the 2001 report, Pruitt requested review before an administrative law judge (ALJ). It argued that the "previous owner's last approved cost report" constituted the most recent report submitted by IHS that was acceptable — or "auditable and appropriate" — based on various criteria set forth in the policy manual. According to Pruitt, nothing in the manual required that the report actually be audited or end on June 30. It asserted, therefore, that the department should have used IHS's ten-month report, which met all manual requirements, to set the 2004 per diem reimbursement rate at $98.94.

The ALJ agreed. He reversed the department's rate determination, finding that the phrase "last approved cost report" was ambiguous and should be construed against the department as the drafter of the manual. The department appealed to its commissioner, who reversed the ALJ's decision and reinstated the department's calculation as the final agency decision. Pruitt then appealed to the superior court, which reversed that final decision.

The department subsequently appealed the superior court's ruling to this Court. In our initial review, we reversed, finding that the superior court did not give proper deference to the department's interpretation of its own policy manual and that at least some evidence supported the final agency decision.[4] The Supreme Court, however, vacated our judgment.

In its opinion, the Supreme Court found that the department's interpretation of the policy manual was not entitled to deference and that this case ultimately involves a contract.[5] Noting that Old Capital Inn's Medicaid-reimbursement agreement incorporated the policy manual, the Supreme Court concluded that the meaning of the phrase "last approved cost report" must be "determined by application of the rules of contract construction."[6] The Supreme Court also

---

[3] Neither party contends that the fiscal year 2003 cost report is relevant to the issues in this case.

[4] *Pruitt I*, supra at 891-892.

[5] *Pruitt II*, supra at 159-160 (2).

[6] Id. at 160 (2).

rejected our conclusion that a final agency decision must be upheld if supported by any evidence. According to the Supreme Court, even if the record supports an agency's factual findings, "the court is statutorily required to examine the soundness of the conclusions of law drawn from [those] findings."[7]

On remand, therefore, we are presented with an issue of contract interpretation. In construing a contract, courts focus on the intent of the parties, and "where the terms of a written contract are clear and unambiguous, [a] court will look to the contract alone to find" that intent.[8] When the contract language is ambiguous, however, the court must apply the rules of contract construction to resolve the ambiguity.[9]

We agree with the ALJ and superior court that the phrase "last approved cost report" is ambiguous. It is not defined in the manual, and the term "approved" is sufficiently vague that it is open to multiple interpretations.[10] We must turn, therefore, to the rules of contract construction. Under OCGA § 13-2-2 (2), words in a contract "generally bear their usual and common signification." Another rule of construction requires us to construe ambiguous contract provisions against the drafter — in this case, the department.[11]

The question here is which IHS cost report was the "last approved" report. The parties agree that a cost report is deemed "acceptable" under the manual if it meets specified criteria. Without dispute, IHS's ten-month 2002 cost report satisfied these criteria. In the department's view, however, an "acceptable" report is not "approved" unless and until it has been audited. And since the department never audited the ten-month report, it refused to use that report to set the reimbursement rate.

The department, however, has not cited any manual provision that references auditing, and the paragraph that addresses rate calculation following an ownership change does not mention an audit or require a June 30 end for the cost report.[12] Moreover, Black's Law

---

[7] Id. at 161 (3).

[8] (Citation and punctuation omitted.) *Unifund Financial Corp. v. Donaghue*, 288 Ga. App. 81, 82 (653 SE2d 513) (2007).

[9] *Sharple v. Airtouch Cellular of Ga.*, 250 Ga. App. 216, 218 (551 SE2d 87) (2001).

[10] See *Archer v. Carson*, 213 Ga. App. 161, 163-164 (2) (444 SE2d 82) (1994) (a word or phrase is ambiguous when its meaning is uncertain and it may fairly be understood in more than one way).

[11] *Hibbard v. P.G.A., Inc.*, 251 Ga. App. 68, 70 (1) (553 SE2d 371) (2001).

[12] Our review has been severely hampered by the department's failure to include the manual in the record. On appeal, the department cites us to its original application for discretionary review, to which it apparently attached excerpts from the manual as exhibits. Exhibits to an application for discretionary appeal, however, are not part of the appellate record. *McClendon v. Advertising That Works*, 292 Ga. App. 677, 679 (1) (665 SE2d 370) (2008). As we recently noted, " '[i]t is the primary responsibility of the appropriate parties and not this

Dictionary defines the word "approve" as "[t]o be satisfied with; to confirm, ratify, sanction, or consent to some act or thing done by another."[13] The term "accept" is similarly defined as "[t]o receive *with approval* or satisfaction."[14] Applying these definitions, the record shows that IHS's ten-month report, which met the manual criteria, was "acceptable" and thus received with approval.

At the hearing before the ALJ, a department representative testified that the department "always establish[es] rates based on a 6/30 year-end" and will not approve an unaudited report. But parol evidence cannot add to, take from, or vary a written contract, and it cannot be used to explain an ambiguous agreement if the rules of contract construction resolve the ambiguity.[15] Construing the change of ownership provision against the department, as we must, we find that the parties intended the phrase "last approved cost report" to refer to an acceptable report that met the manual's criteria.

In reaching this conclusion, we recognize that a cost report ultimately may need to be audited before the department uses it to calculate a reimbursement rate. Nothing in the contract language, however, disqualifies an unaudited report that *can be audited* from use as the "last approved cost report." To find otherwise would allow the department to unilaterally refuse to audit and thus ignore acceptable cost reports — a result not contemplated by the parties' agreement.

We further note that, in this case, the department declined to audit IHS's ten-month report based solely on the fact that the report's data ended in April 2002, rather than at the conclusion of the fiscal year in June 2002. On appeal, however, the department has not cited any manual provision that *prevents* it from auditing a ten-month report ending in April, and the record shows that rates can be calculated based on as little as six months of data.[16]

Finally, the ALJ found that the department recalculates nursing home reimbursement rates each year so that it can set the rates "at a level that is as close to the costs that [the facilities] are actually

---

court to ensure that all documents relevant to the disposition of an appeal be duly filed with the clerk of this court prior to the issuance of our appellate decision.' " Id. Luckily, the parties agree in their briefs on the substantive language of the ownership change provision at issue here, as well as the manual's cost report criteria. But we have found no such agreement as to other portions of the manual, and we do not have the manual itself to reference.

[13] Black's Law Dictionary, 102 (6th ed. 1990).

[14] (Emphasis supplied.) Id. at 12.

[15] *Unifund*, supra at 83; *Sharple*, supra at 218; OCGA § 13-2-2.

[16] The manual explicitly prohibits a facility from estimating amounts in a cost report that does not end on June 30 in order to convert the report to a June 30 year-end. Pruitt, however, has not sought to estimate anything here. Instead, it wants to rely on the actual data generated by IHS in the ten months prior to the ownership change.

incurring." The department's final agency decision incorporated this factual finding, and the department does not challenge it on appeal. An actual cost approach is also reflected in the requirement that facilities submit cost report data each year for rate calculation.

Given this overall focus on current costs, we reject the department's claim that the parties intended to ignore the available information in IHS's 10-month 2002 cost report and calculate Old Capital Inn's 2004 reimbursement rate based on stale data from 2001.[17] Accordingly, the trial court properly reversed the agency's determination.

*Judgment affirmed. Miller, C. J., and Ellington, J., concur.*

DECIDED JANUARY 23, 2009.

*Thurbert E. Baker, Attorney General, Evan R. Kaplan, Michelle Townes, Assistant Attorneys General*, for appellants.

*Arnall, Golden & Gregory, Glenn P. Hendrix, Richard E. Gardner III*, for appellees.

---

[17] See *Robertson v. N. N. Investors Life Ins. Co.*, 192 Ga. App. 122 (1) (385 SE2d 681) (1989) (contract language must be construed according to the parties' intent and understanding, and a court interpreting the language " 'cannot go further than a fair construction of the language used will permit' ").