**SOUTHERN COMMUNICATIONS SERVICES, INC. d/b/a Southern-LINC Wireless, Plaintiff,**

v.

**Derek THOMAS, individually and on behalf of others similarly situated, Defendant.**

**Civil Action No. 1:10–CV–2975–AT.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Nov. 3, 2011.

John P. Hutchins, Robert P. Williams, II, Troutman Sanders, LLP, Atlanta, GA, for Plaintiff.

Richard J. Burke, Freed & Weiss, LLC, St. Louis, MO, Alan G. Snipes, Pope McGlamry Kilpatrick Morrison & Norwood, LLP, Columbus, GA, for Defendant.

### ORDER

AMY TOTENBERG, District Judge.

This case is before the Court on Plaintiff Southern Communications Services, Inc., D/B/A SouthernLINC Wireless' ("SouthernLINC") Motion to Vacate [Doc. 1] two arbitration awards: a Clause Construction Award and a Class Determination Award. By issuing these two awards, the arbitrator answered two questions the parties submitted to him in turn: 1) whether their arbitration agreement authorizes class arbitration and 2) what class, if any, he should certify. The arbitrator determined first that the arbitration clause in the parties' agreement permits class arbitration and second that the class—including Defendant Derek Thomas, individually and on

behalf of others similarly situated (the "Customers")—meets the applicable class certification criteria. SouthernLINC now argues that the arbitrator exceeded his authority in making these determinations and moves for the Court to vacate both awards. For the following reasons, the arbitrator did not in fact exceed his authority, and the Court has no jurisdiction to vacate his awards. Accordingly, SouthernLINC's Motion is **DENIED.**

## I. Background

Defendant Thomas contracted with Plaintiff SouthernLINC for cellular phone service in June 2005. (Demand [1–4] ¶ 32). As a condition of obtaining service from SouthernLINC, Thomas and other Customers were required to agree to a standard form contract (the "Agreement") including non-negotiable "Terms and Conditions" drafted by SouthernLINC. *Id.* at ¶ 16, Ex. A. This Agreement states that it is governed by Georgia law. *Id.* at Ex. A ¶ 18. The Agreement includes a clause requiring a Customer to pay a $200 early termination fee ("ETF") if he or she terminates the contract early. *Id.* at Ex. A ¶ 6. The Agreement also includes a clause requiring any disputes to be resolved through binding arbitration (the "Arbitration Clause"). *Id.* at ¶ 6, Ex. A ¶ 17. The Arbitration Clause specifies that the parties "will conduct the arbitration ... pursuant to applicable Wireless Industry Arbitration rules of the American Arbitration Association" (the "WIA Rules" of the "AAA"). *Id.* at ¶ 6, Ex. A ¶ 17.

In February 2008, Thomas cancelled his phone service before the end of the contract term and refused to pay the ETF, and SouthernLINC refused to waive this fee and threatened collection action. *Id.* at ¶ 33–34. On July 31, 2008, pursuant to the Arbitration Clause, Thomas filed a demand with the AAA on behalf of himself and the other Customers challenging the

ETFs as illegal penalties. (Demand [1–4] ).

As a threshold matter, the arbitrator's first duty was to determine whether the Arbitration Clause permitted class arbitration. He derived his authority to make this determination from the AAA's Supplementary Rules for Class Arbitrations ("Supplementary Rules"), which were incorporated by reference into the WIA Rules, which were specified by the Arbitration Clause. (Clause Const. Award [1–2] at 2). AAA Supplementary Rule 3 makes a "Clause Construction Award" the first step in any AAA class action proceeding and provides that "the arbitrator shall determine as a threshold matter, in a reasoned, partial final award on the construction of the arbitration clause, whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class." *Id.*

The parties disputed whether the Arbitration Clause authorized this action to proceed on behalf of a class and submitted briefs for the arbitrator's consideration: the Customers filed a Motion; SouthernLINC filed a Brief in Opposition; the Customers filed a Reply; and both parties filed supplemental briefs following the arbitrator's request. *Id.* at 1. Discovery and briefings continued for over six months. The parties did not dispute the arbitrator's jurisdiction to decide this issue. *Id.* at 2.

The crux of this dispute was whether the parties intended to permit class proceedings. The parties argued their opposing positions regarding their intent in their briefs to the arbitrator and submitted to his authority to render a decision on this issue. The Customers argued that "there is no evidence of any mutual intent to prohibit class arbitration." (Claimant's Reply Supp. Mot. Prelim. Clause Const. Award [1–10] at 2). Conversely, SouthernLINC argued that "the parties' [sic] in-

tended to preclude class arbitrations." (Resp. Br. Opp. Claimant's Mot. Prelim. Clause Const. Award [1–11] at 3). The parties took "opposite positions on whether the arbitration clauses' [sic] silence on class arbitration does or does not create an ambiguity." (Clause Const. Award [1–2] at 5).

On April 2, 2009, the arbitrator issued a Clause Construction Award after finding that the Arbitration Clause permitted class arbitration. *Id.* at 4. He concluded that "class arbitration is permitted by the arbitration clause under Georgia authority on class arbitrations, United States Supreme Court precedent on arbitration, and Georgia rules of contract construction." *Id.* at 4. The arbitrator recognized that "prior unconfirmed clause construction awards have little precedential value for purposes of this Clause Construction Award." *Id.* Instead, he based his decision "solely upon [his] analysis of the facts and law applicable to the parties' Agreement here." *Id.*

■ The arbitrator began his analysis of the Agreement by recognizing that Georgia law applies and that "a fundamental principle of contract construction is that a contract is to be construed against the drafter," *Id.* at 5, citing *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 62–63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) ("[A] court should construe ambiguous language against the interest of the party that drafted it .... [The drafter of] an ambiguous document ... cannot ... claim the benefit of the doubt. The reason for this rule is to protect the party who did not choose the language from an unintended or unfair result."); *see also Dept. of Community Health v. Pruitt Corp.,* 295 Ga.App. 629, 673 S.E.2d 36, 39 (2009) ("Another rule of construction requires us to construe ambiguous contract provisions against the drafter...."). The arbitrator reasoned that to reject the Customers' argument that they intended to authorize class arbitration would "effectively impute an intent to the non-drafters to give up unknown rights that were not expressly disclosed or discussed in the contract." (Clause Const. Award [1–2] at 5). Following this contract construction analysis under Georgia law, he concluded that there was no intent to bar arbitration and that "Georgia contract law ... permits class arbitration."[1] *Id.* at 5–6.

The arbitrator further reasoned that to reject the Customers' argument that they intended to authorize class arbitrations would effectively deny them the ability to vindicate their rights under Georgia law, citing *Dale v. Comcast Corp.,* 498 F.3d 1216 (11th Cir.2007). In *Dale,* customers brought a class action against Comcast Corporation to recover for its alleged failure to pass through cost savings resulting from decreased franchise fees to its cus-

---

1. In light of *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.,* —— U.S. ——, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010), which was decided after the arbitrator issued his award in the present case, it is now clear that the proper inquiry ought not be whether the intent was to bar class arbitration, but whether the intent was to authorize it. *Id.* at 1776. However, the parties agreed that the question they were submitting to the arbitrator pursuant to AAA rules was whether they intended to *permit* class arbitration. (Claimant's Mot. Prelim. Clause Const. Award [1–9] at 7; Resp.'s Br. in Opp. Claimant's Mot. Prelim. Clause Const.

Award [1–11] at 2). The arbitrator's analysis, using principles of contract interpretation under Georgia law, included an examination of the language of the contract to determine the parties' implicit intent to permit class arbitration. That the arbitrator phrased his conclusion in the negative does not change the fact that he decided a question that was properly before him. *See Jock v. Sterling Jewelers Inc.,* 646 F.3d 113, 125 (2d Cir.2011) (arbitrator's phrasing of conclusion in negative was "of no moment" where she properly analyzed question before her under Ohio law).

tomers, as required by federal law. *Id.* at 1217–18. Comcast moved to dismiss the case and compel arbitration based on its mandatory arbitration agreement with its customers, which included a class action waiver. *Id.* at 1218. The Eleventh Circuit concluded that "the enforceability of a particular class action waiver in an arbitration agreement must be determined on a case-by-case basis, considering the totality of the facts and circumstances," and held that under the facts and circumstances before it, the arbitration agreement was unconscionable and unenforceable. *Id.* at 1224. The court reasoned that the agreement was unconscionable under Georgia law because no provision existed for the recovery of attorneys' fees and costs in the absence of bad faith, and "[w]ithout the benefit of a class action mechanism, the subscribers would effectively be precluded from suing Comcast" because no single subscriber would be able to retain representation since "[t]he cost of vindicating an individual subscriber's claim, when compared to his or her potential recovery, is too great." *Id.* at 1224. In the present case, the arbitrator applied *Dale* to the facts before him and concluded that Georgia law authorized class proceedings in this situation because the Customers' claims are relatively small and there is no guaranty that attorneys' fees would be recoverable.[2] (Clause Const. Award [1–2] at 7).

For over a year after the arbitrator issued the Clause Construction Award, the parties conducted discovery and submitted briefs regarding class determination. On June 24, 2010, the arbitrator issued a Class Determination Award, finding that the Customers had met the criteria for class arbitration and certifying the following class: "All consumer subscribers to SouthernLINC's wireless telephone service pursuant to contracts which include an early termination fee provision, and who paid or have been charged an early termination fee by SouthernLINC after July 31, 2004."[3] (Class Determ. Award [1–3] at 22.)

After the Supreme Court issued its decision in *Stolt–Nielsen v. AnimalFeeds Int'l Corp.,* — U.S. ——, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010), SouthernLINC asked the arbitrator to reconsider his decision in light of that case, and the parties submitted briefs to him during July and August 2010. (Ruling Resp. Mot. Recons. [14–1] at 1). The arbitrator decided that he had no jurisdiction to reconsider the Clause Construction Award, and that "even if such jurisdiction existed ... the Clause [Construction] Award satisfies the rigorous standards set forth in *Stolt–Nielsen.*" *Id.* at 2. He pointed out that "[e]ven before *Stolt–Nielsen,* [he] sought to perform the rigorous analysis that *Stolt–Nielsen* imposed." *Id.* He concluded that the Clause

**2.** After the arbitrator issued his award in the present case, the Eleventh Circuit decided a case similar to *Dale.* In *Cruz v. Cingular Wireless, LLC,* 648 F.3d 1205 (2011), the court held that a Florida law classifying "most collective-arbitration waivers in consumer contracts [is] unconscionable, and thus preempted by the FAA" insofar as it "would invalidate these agreements as contrary to public policy." *Id.* at 1206–07 (punctuation and citation omitted). However, the court did not reach the question of whether "in some cases, an arbitration agreement may be invalidated on public policy grounds where it effectively prevents the claimant from vindicating her statu-

tory cause of action." *Id.* at 1215. Importantly, *Cruz* has limited applicability to the present case because it dealt with an arbitration agreement containing an *express* class action waiver, not interpretation of state contract law where the written arbitration agreement is *silent* as to class arbitration.

**3.** Certain parties were excluded from the class, such as SouthernLINC and its affiliates, parents, subsidiaries, officers, directors, employees, their family members, and members of the AAA and their family members. (Class Determ. Award [1–3] at 22.)

Construction Award was valid because he "based [it] on a rule of law or rule of decision as *Stolt–Nielsen* requires." *Id.* at 5.

On September 17, 2010, SouthernLINC filed this motion to vacate both the Clause Construction Award and the Class Determination Award on the grounds that the arbitrator exceeded his authority by issuing each of these awards [Doc. 1].

## II. Analysis

### A. Timeliness of the motion to vacate

As a threshold matter, the Customers argue that SouthernLINC is precluded from moving to vacate the Clause Construction Award (where the arbitrator determined that class arbitration was authorized by the Agreement) because it was ripe for review in April 2009 and Southern-LINC should have moved to vacate it prior to the issuance of the Class Determination Award (which certified the class). Section 12 of the FAA provides that "[n]otice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered." 9 U.S.C. § 12. Section 12 effectively creates a three month statute of limitations for filing a motion to vacate an arbitral award.

The Customers argue that Section 12 applies to the Clause Construction Award and that SouthernLINC's failure to move to vacate this award within three months of its issuance bars the Court from considering its motion. However, Southern-LINC points out that courts have considered Clause Construction Awards "partial awards" that do not become final and subject to review until the arbitrator issues a Class Determination Award, citing *Dealer Computer Servs. v. Dub Herring Ford,* 547 F.3d 558 (6th Cir.2008) (holding that Clause Construction Award was not yet ripe but could be reviewed after issuance of Class Determination Award); *see also Stolt–Nielsen,* 130 S.Ct. at 1779 (Ginsberg, J., dissenting) (prior to *Stolt–Nielsen* ruling, the Supreme Court had never before considered a "partial award" such as a Clause Construction Award to be ripe for review). The Customers cite no authority specifically indicating that Section 12 applies to a Clause Construction Award. Instead, they argue that because the Supreme Court found in *Stolt–Nielsen* that a Clause Construction Award was ripe for review prior to issuance of a Class Determination Award, SouthernLINC had three months from the issuance of the Clause Construction Award to move to vacate it. The Supreme Court did not address whether § 12 applies to Clause Construction Awards following its *Stolt–Nielsen* decision.

It is not entirely clear whether *Stolt–Nielsen* subjects Clause Construction Awards to the three month limitation imposed by § 12. For purposes of the present case, it is sufficient that § 12 did not apply to the Clause Construction Award when it was issued on April 2, 2009, which was over a year before *Stolt–Nielsen* was decided. Even if *Stolt–Nielsen* did create a new rule applying § 12 to Clause Construction Awards—a question this Court need not answer—it did not apply when the Clause Construction Award was issued a year prior. Therefore, the Court assumes without deciding that Southern-LINC's motion to vacate was timely.

### B. Whether the arbitrator exceeded his authority by issuing the Clause Construction Award

SouthernLINC argues that the court should vacate the Clause Construction Award because the arbitrator exceeded his authority by allowing this case to proceed as a class arbitration when the written Agreement does not affirmatively author-

ize class arbitration. (Pl.'s Br. Supp. Mot. Vacate Clause Const. and Class Determ. Awards [1–1] at 3). The Customers argue that the arbitrator's determination was valid because he fulfilled his duty to apply a rule of law governing contract interpretation in order to ascertain the parties' intent to authorize class arbitration. (Def.'s Br. Opp. Mot. Vacate Clause Const. and Clause Determ. Awards [7] at 12–13).

### 1. Standard of Review

■ It is undisputed that the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 *et seq.*, applies to this case. The FAA "imposes a heavy presumption in favor of confirming arbitration awards." *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1288 (11th Cir.2002) (citation omitted). The Court must give the arbitrator's decision great deference.[4] *See Lifecare Intern., Inc. v. CD Medical, Inc.*, 68 F.3d 429, 433 (11th Cir.1995) ("[F]ederal courts should defer to the arbitrator's resolution of the dispute whenever possible.") (internal quotes and citation omitted). The Supreme Court has repeatedly affirmed the FAA's "national policy favoring arbitration with just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway." *Hall St. Associates, L.L.C. v. Mattel, Inc.*, 552 U.S.

576, 577, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008) (citation omitted). Accordingly, judicial review of arbitration awards is "narrowly limited" under the FAA. *B.L. Harbert Int'l, LLC v. Hercules Steel Co.*, 441 F.3d 905, 909 (11th Cir.2006), *abrogated on other grounds by Frazier v. CitiFinancial Corp., LLC*, 604 F.3d 1313 (11th Cir.2010).

■ "Sections 10 and 11 of the FAA, 9 U.S.C. §§ 10, 11, provide the exclusive means by which a federal court may upset an [arbitrator's] award." *White Springs Agric. Chemicals, Inc. v. Glawson Investments Corp.*, 660 F.3d 1277, 1280 (11th Cir.2011) (citing *Hall St.*, 552 U.S. at 586, 128 S.Ct. 1396). Section 10 only permits a district court to vacate an award upon limited specified grounds:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

---

**4.** SouthernLINC argues that "an award issued without authority is entitled to no deference at all" and that the deferential standard of review is only applicable "when the arbitration under review is actually authorized by the arbitration agreement." (Pl.'s Reply Br. Supp. Mot. Vacate Clause Const. and Clause Determ. Awards [11] at 5). To accept this argument, the Court would need to assume that the arbitrator had no authority to decide that the parties intended to authorize class arbitration. The Court cannot make such an assumption because whether or not the arbitrator exceeded his authority is the central issue the Court is being asked to decide on this motion. SouthernLINC cites no case where a court has decided the central question presented to it before determining the

appropriate standard of review, and the Court has found none. SouthernLINC also has not cited any law suggesting an alternative standard of review, and the Court has found none. In fact, the Supreme Court recognized that even where a party is arguing that arbitrators exceeded their authority by allowing a class arbitration to proceed, that party "must clear a high hurdle" because "[i]t is not enough" to show that the arbitrator "committed an error—or even a serious error. It is only when an arbitrator strays from interpretation and application of the agreement and effectively 'dispenses his own brand of industrial justice' that his decision may be unenforceable." *Stolt–Nielsen*, 130 S.Ct. at 1767 (internal citations omitted).

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). Section 11 empowers a district court to modify an arbitral award "[w]here the arbitrators have awarded upon a matter not submitted to them." 9 U.S.C. § 11(b); *White Springs*, 660 F.3d at 1280 (11th Cir.2011). "Because these Sections are the exclusive means for upsetting an arbitration award, [an arbitrator's] incorrect legal conclusion is not grounds for vacating or modifying the award." *Id.* In the Eleventh Circuit, even when an arbitrator manifestly disregards the law, a district court has no jurisdiction to vacate the award.[5] *Frazier v. CitiFinancial Corp., LLC*, 604 F.3d 1313, 1324 (11th Cir.2010).

 For purposes of SouthernLINC's motion, the relevant statutory grounds for vacatur are where "the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4). In order to prove that the arbitrator exceeded his power, SouthernLINC "must clear a high hurdle" because "[i]t is not enough" to show that the arbitrator "committed an error—or even a serious error." *Stolt–Nielsen*, 130 S.Ct. at 1767. "[T]he interpretations of the law by the arbitrators ... are not subject, in the federal courts, to judicial review for error in interpretation." *Wilko v. Swan*, 346 U.S. 427, 436–437, 74 S.Ct. 182, 98 L.Ed. 168 (1953), *overruled on other grounds by Rodriguez de Quijas v. Shearson/American Exp., Inc.*, 490 U.S.

477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). "It is only when an arbitrator strays from interpretation and application of the agreement and effectively 'dispenses his own brand of industrial justice' that his decision may be unenforceable." *Stolt–Nielsen*, 130 S.Ct. at 1767 (internal citations omitted).

Therefore, the question before the Court is not whether the arbitrator erred while applying Georgia law when finding that the class arbitration was implicitly authorized under the Agreement, but whether he exceeded his powers and dispensed his own brand of industrial justice by straying from interpretation and application of the Agreement in light of applicable law.

### 2. Interpreting an agreement which is silent on class arbitration

 Agreements to arbitrate disputes are contractual and "a matter of consent, not coercion." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). As private dispute resolution is consensual by nature, "parties are generally free to structure their arbitration agreements as they see fit." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). Under certain circumstances, a party may be able to preclude class proceedings by including explicit terms in its arbitration agreement. *See AT & T Mobility LLC v. Concepcion*, —— U.S. ——, 131 S.Ct. 1740, 1746–47, 179 L.Ed.2d 742 (2011) (holding that California

---

**5.** Prior to the Supreme Court's pronouncement in *Hall Street* that the statutory grounds are exclusive, courts had crafted other grounds for vacatur, including "manifest disregard for the law." Jill Gross, *Hall Street Blues: The Uncertain Future of Manifest Disregard*, 37 No. 3 Sec. Reg. L. J. Art 2 (2009). In order to persuade a court to vacate an award because of manifest disregard for the law, a party usually "must show: (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether; and (2) the law that the arbitrators ignored was well defined, explicit, and clearly applicable to the case." *Id.* However, since *Hall Street*, several federal circuits—including the Eleventh Circuit—have explicitly rejected manifest disregard for the law as a valid grounds for vacatur under the FAA. *Id.*

law preventing companies from including class action waivers· in its contracts with consumers is preempted by the FAA). But where the arbitration agreement appears to be silent as to class arbitration, it is necessary to determine the parties' intent to authorize class proceedings. *Stolt–Nielsen,* 130 S.Ct. at 1776 (emphasis omitted).

 As arbitration is contractual, "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Id.* at 1775. However, federal law is silent on "what contractual basis may support a finding that the parties agreed to authorize class-action arbitration." *Id.* at 1776 n. 10. Generally, when determining parties' intent, the tribunal "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Under ordinary state-law contract formation principles, a party need not specify every term of the contract—some terms may be implied by operation of law. *See* Restatement (Second) of Contracts § 5(2) (1981) ("A term of a contract is that portion of the legal relations *resulting from* the promise or set of promises which relates to a particular matter, *whether or not the parties manifest an intention to create those relations.*") (emphasis added); *id.* at cmt. b (implied terms of an agreement

"are sometimes stated in terms of presumed intention"). Clearly, presumed or implicit intent to authorize class arbitration cannot be inferred "*solely* from the fact of the parties' agreement to arbitrate." *Stolt–Nielsen,* 130 S.Ct. at 1758. (emphasis added). A tribunal must identify a "default rule" if it is to conclude that the parties implicitly authorized class arbitration. *Id.* at 1768–69.

### 3. *Stolt–Nielsen:* arbitrator must apply law—not policy—when interpreting arbitration agreements

When interpreting an arbitration agreement, an arbitrator may not impose personal policy preferences on the parties. An arbitrator's award construing an agreement to permit class arbitration may be vacated when he exceeds his power and dispenses his own brand of industrial justice by imposing policy preferences instead of identifying and applying a "default rule" under applicable law governing contract interpretation.[6] *Stolt–Nielsen,* 130 S.Ct. at 1768–70.

In *Stolt–Nielsen,* a group of animal feed suppliers filed a demand for class arbitration to resolve a dispute with a shipping company over purported price–fixing.[7] *Id.* at 1765. Before submitting the question of whether class arbitration was permitted to a panel of arbitrators, the parties stipulated that their arbitration agreement was "silent" regarding class arbitration. *Id.* at

---

6. *See also Concepcion,* 131 S.Ct. at 1750 ("[I]n *Stolt–Nielsen* .... we held that an arbitration panel exceeded its power under § 10(a)(4) of the FAA by imposing class procedures based on policy judgments rather than the arbitration agreement itself or some background principle of contract law that would affect its interpretation.")

7. The Court notes that the precedential value of *Stolt–Nielsen* is questionable because the parties in that case were all sophisticated business entities, in contrast to the situation

here involving a mandatory consumer arbitration agreement. *See Stolt–Nielsen,* 130 S.Ct. at 1783 (2010) (Ginsburg, J., dissenting) ("I note some stopping points in the Court's decision.... [B]y observing that 'the parties [here] are sophisticated business entities,' ... the Court apparently spares from its affirmative-authorization requirement contracts of adhesion presented on a take-it-or-leave-it basis."). However, the Court here assumes without deciding that *Stolt–Nielsen* applies because the outcome of this case is the same whether it applies or not.

1766. The panel concluded that the arbitration agreement allowed for class arbitration because many other arbitrators had found a "wide variety of clauses in a wide variety of settings as allowing for class arbitration." *Id.* (internal quotes omitted). The shipping company filed an application to vacate the panel's award. *Id.* at 1766. The district court vacated the award, holding that the arbitrators manifestly disregarded the law by failing to conduct a choice of law analysis. *Id.* at 1766. The Second Circuit reversed, holding that the arbitrators' decision was not made in manifest disregard of the law. *Id.* at 1766–67. The Supreme Court granted certiorari. *Id.* at 1767.

Although the Supreme Court did not specifically address the "manifest disregard" standard,[8] it reversed the Second Circuit, holding that the award should be vacated because the panel exceeded its powers by imposing "its own policy choice" on the parties rather than looking to a rule of law governing contract interpretation. *Id.* at 1770 ("[I]nstead of identifying and applying a rule of decision derived from the FAA or either maritime or New York law, the arbitration panel imposed its own policy choice and thus exceeded its powers."). As the agreement was silent regarding class arbitration, "the arbitrators' proper task was to identify the rule of law that governs in that situation." *Id.* at 1768. The majority opinion pointed out that "the task of an arbitrator is to interpret and enforce a contract, not to make public policy." *Id.* at 1767. As the panel "appear[ed] to have rested its decision on [a] public policy argument," it had exceeded its powers. *Id.* at 1768.

Furthermore, the majority opinion pointed out that the arbitrators may never have had the power to determine the parties' intent at all. The court stated that the arbitrators "had no occasion to 'ascertain the parties' intention' ... because the parties were in *complete agreement* regarding their intent." *Id.* at 1758. (emphasis added). Before submitting the question of whether class arbitration was permitted to the arbitrators, the parties had stipulated that there was "no agreement" reached on that issue. *Id.* at 1776. "This stipulation left no room for an inquiry regarding the parties' intent, and any inquiry into that settled question would have been outside the panel's assigned task." *Id.* at 1770. As the arbitrators attempted to ascertain intent which had already been stipulated and then imposed their personal policy preferences instead of applying a rule of law governing contract interpretation, they exceeded their powers, and vacatur was warranted.

### 4. SouthernLINC's interpretation of *Stolt–Nielsen*

In the present case, SouthernLINC argues that as the written Agreement was silent regarding class arbitration, the Supreme Court's decision in *Stolt–Nielsen* compels the conclusion that this silence precludes class arbitration and therefore the arbitrator exceeded his authority by deciding otherwise. (Pl.'s Br. Supp. Mot. Vacate Clause Const. and Class Determ. Awards [1–1] at 15–18). SouthernLINC argues that *Stolt–Nielsen* establishes a bright-line rule that a company must affirmatively authorize class arbitration in its mandatory contracts with customers, and in the absence of such express authorization, class proceedings are automatically precluded. *Id.*

To persuade the Court to accept its interpretation, SouthernLINC directs the Court to two district court cases in other

---

8. The Supreme Court chose not to address whether "manifest disregard" survived its decision in *Hall Street* as a grounds for vacatur under the FAA. *Id. at* 1768 n. 3. It assumed without deciding that the standard applied and was satisfied in *Stolt–Nielsen*. *Id.*

jurisdictions: *In re Checking Account Overdraft Litig.*, No. 09–MD–02036–JLK, 2010 WL 3361127 (S.D.Fla. Aug. 23, 2010), and *Jock v. Sterling Jewelers, Inc.*, 725 F.Supp.2d 444 (S.D.N.Y.2010). During the period since SouthernLINC submitted its briefings, these cases have been vacated and reversed, respectively. *See In re Checking Account Overdraft Litig.*, 425 Fed.Appx. 826 (11th Cir.2011); *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113 (2d Cir.2011). As *Checking Account Overdraft* had nothing to do with class arbitration, and as the court on remand explicitly rejected the reasoning upon which Southern-LINC relies, this case carries no persuasive force.[9] On the other hand, *Jock v. Sterling Jewelers, Inc.* is directly analogous to the present case with a holding specifically on point and therefore warrants examination.

In *Jock*, several employees brought an arbitration claim against their employer and submitted the question of whether their arbitration agreement allowed for class arbitration to the arbitrator. *Jock*, 646 F.3d at 116. Noting that the question of intent is "problematic in the context of a contract of adhesion," the arbitrator construed the contract in accordance with Ohio law, as required by the terms of the agreement, and interpreted the contract against its drafter. *Id.* at 117. The arbitrator cited Ohio case law providing that "the law will not insert by construction for the benefit of one of the parties an exception or condition which the parties either by design or neglect have omitted from their own contract." *Id.* (citing *Montgomery v. Bd. of Educ. of Liberty Township, Union Cty.*, 102 Ohio St. 189, 193, 131 N.E. 497 (1921)) (punctuation omitted). Based on this applicable law, the arbitrator determined she would not read into the agreement intent to prohibit class claims. *Id.*

The employer then moved to vacate the arbitral award. *Id.* at 117. The district court denied the motion, holding that the arbitrator did not exceed her power by reaching the issue of whether the arbitration agreements prohibited class proceedings and that her decision was not made in manifest disregard of the law. *Id.* at 117–18. After the Supreme Court decided *Stolt–Nielsen*, the employer moved in the district court for relief from its order. *Id.* at 118. The district court held that if its jurisdiction were restored, it would reconsider its order and vacate the arbitrator's

---

**9.** In *Checking Account Overdraft*, a bank sought to compel arbitration against one of its customers. *Checking Account Overdraft*, 2010 WL 3361127, at *1. The district court held that the arbitration agreement in question was unenforceable because it was procedurally and substantively unconscionable. *Id.* at *3. The court found that the agreement was substantively unconscionable for several reasons. One of these reasons is that the agreement did not explicitly authorize class arbitration, thus, according to the court, this lack of an explicit authorization operated as a class action waiver. *Id.* at *2. In reaching this conclusion, the court looked to *Stolt–Nielsen* and reasoned that "unless the parties explicitly contract for class-action arbitration, the parties cannot engage in class action arbitration." *Id.* In its briefings in the present case, SouthernLINC mischaracterizes this judicial dicta as the holding of the case in an attempt to show the *Checking Account Overdraft* court agrees with its interpretation of *Stolt–Nielsen*. (Pl.'s Br. Supp. Mot. Vacate Clause Const. and Class Determ. Awards [1–1] at 16). However, after the Eleventh Circuit vacated and remanded *Checking Account Overdraft* for reconsideration in light of the Supreme Court's ruling in *Concepcion*, the district court explicitly rejected its previous reasoning (upon which SouthernLINC now relies) and refused to consider the absence of class action availability in its unconscionability analysis. *In re Checking Account Overdraft Litig.*, 09–MD–02036–JLK, 813 F.Supp.2d 1365, 1370, 2011 WL 4454913, at *1 (S.D.Fla. Sept. 1, 2011) (reconsidering "its ruling on unconscionability, without consideration of the class-action waivers in the Agreement").

award. *Jock,* 725 F.Supp.2d at 450. The district court found that *Stolt–Nielsen* was not distinguishable on the facts and concluded that in light of the Supreme Court's ruling, "the arbitrator's construction of the [arbitration] agreements as permitting class certification was in excess of her powers and therefore cannot be upheld." *Id.* at 448–50.

After SouthernLINC submitted its briefings in the present case pointing to the district court's reconsidered decision in *Jock* as persuasive authority, the Second Circuit reversed that decision and confirmed the arbitrator's award, holding that she did not exceed her authority by concluding that the agreement authorized class arbitration. *Jock,* 646 F.3d at 127. The circuit court held that the district court had erred by focusing "on whether the arbitrator had correctly interpreted the arbitration agreement itself" rather than on whether she had the authority to render her interpretation. *Id.* at 123. The circuit court reasoned that under the appropriate standard of review, it is not for the district court to decide whether the arbitrator " 'got it right' when the question has been properly submitted to the arbitrator and neither the law nor the agreement categorically bar her from deciding that issue." *Id.* at 124 (citation omitted). According to the circuit court's opinion, "[b]y re-examining the record to determine the question that the arbitrator had already decided," the district court erred by "substitut[ing] its legal reasoning for the arbitrator's." *Id.* at 126.

In *Jock,* as in the present case, the party moving to vacate the arbitration award argued that the lack of an explicit authorization of class arbitration in the agreement made an award allowing class arbitration impossible after *Stolt–Nielsen.* The Second Circuit rejected this argument, pointing out that *Stolt–Nielsen* "did not create a bright-line rule requiring that arbitration agreements can only be construed to permit class arbitration where they contain express provisions permitting class arbitration." *Id.* at 124 (citing *Stolt–Nielsen,* 130 S.Ct. at 1776 n. 10 ("We have no occasion to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration.")). According to the Second Circuit, "*Stolt–Nielsen* does not foreclose the possibility that parties may reach an implicit—rather than express—agreement to authorize class-action arbitration." *Id.* at 123 (internal quotes and citation omitted).

In holding that the arbitrator did not exceed her authority, the court first concluded that the arbitrator had the power to ascertain whether the parties implicitly authorized class arbitration because the parties submitted that question to the arbitrator for her determination. *Id.* at 123–24. The court distinguished *Stolt–Nielsen* on the facts because although the plaintiffs at one point conceded the agreement was silent regarding class arbitration, this "was not the same thing as stipulating the parties had reached no agreement on the issue ... and there is no escaping the fact that the parties submitted that question to the arbitrator for a decision." *Id.* at 123–24. The court then concluded that the arbitrator did not exceed her power when making that determination because she did not impose her personal policy preference—instead she looked to applicable law governing contract interpretation. *Id.* at 125–26. Accordingly, the court held that the district court erred in holding it would vacate the arbitral award because "whether the arbitrator was right or wrong in her analysis, she had the authority to make the decision, and the parties to the arbitration are bound by it." *Id.* at 127.

This Court finds the Second Circuit's interpretation of *Stolt–Nielsen* to be far more persuasive and legally sound than

the interpretation SouthernLINC advances. To adopt SouthernLINC's theory that an arbitrator should automatically assume the parties intended to preclude class arbitration any time class proceedings are not explicitly authorized in writing would require the Court to ignore the arbitrator's duty to apply a rule of law governing contract interpretation to determine the parties' intent. *See Stolt–Nielsen*, 130 S.Ct. at 1768 (the arbitrator's "proper task" is to "identify the rule of law that governs in that situation"). When the parties dispute their intent to authorize class arbitration, the arbitrator's proper task is *not* to side with one party and assume the arbitration agreement's silence ends the inquiry as to intent—it is to make that inquiry based on applicable contract law and to avoid imposing policy preferences. *Stolt–Nielsen* did not *displace* common law contract interpretation rules such as the well-settled principle of interpreting ambiguous contracts against the drafter. Instead, it *reinforces* common law contract interpretation rules by requiring arbitrators to identify these rules when analyzing the parties' intent to authorize class arbitration.

### 5. Whether the arbitrator exceeded his authority in the present case

In the present case, the Court must determine 1) whether the arbitrator exceeded his power by considering issues beyond those the parties properly submitted for his consideration, and 2) whether he exceeded his power by imposing his personal policy preferences rather than inquiring whether applicable law provides an appropriate default rule in this situation. As to the latter inquiry, the distinction is clear: when arbitrators ignore the law and rely solely on policy when interpreting an arbitration agreement—as in *Stolt–Nielsen*—they exceed their power, but when they identify applicable law to guide their inquiry—as in *Jock*—district courts have

no jurisdiction under the FAA to vacate their awards.

### a. The arbitrator had the power to interpret the Agreement in order to determine the parties' intent

■ To determine whether the arbitrator in the present case exceeded his power to interpret the Agreement, the Court must necessarily identify the scope of his authority. Generally, the question of whether an arbitration agreement authorizes class arbitration is a "matter of contract interpretation [and] should be for the arbitrator, not the courts, to decide." *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 453, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003). More importantly, the parties here specifically granted the arbitrator the power to interpret their agreement and decide whether it authorized class arbitrations, both in writing and by their conduct.

■ First, the Agreement itself bestowed the power to determine the question of implicit class arbitration authorization upon the arbitrator. "Because arbitrators derive their powers from the parties' agreement, we look to the terms of the governing arbitration clause to determine the powers of the [arbitrator]." *White Springs Agric. Chemicals, Inc. v. Glawson Investments Corp.*, 660 F.3d 1277, 1281 (11th Cir.2011) (punctuation and citation omitted). The Arbitration Clause in the Agreement provided that "[t]he parties will conduct the arbitration in Atlanta, Georgia pursuant to applicable Wireless Industry Arbitration Rules of the American Arbitration Association." (Pl.'s Br. Supp. Mot. Vacate Clause Const. and Class Determ. Awards [1–1] at 5). Thus, the AAA Wireless Industry Arbitration Rules (the "WIA Rules") were incorporated into the Agreement by reference. The WIA Rules incorporate the AAA Supplementary Rules for Class Arbitrations, which gave the arbitrator the

power to decide whether the Arbitration Clause implicitly authorized class proceedings. (Clause Const. Award [1–2] at 1).

Furthermore, the parties both consented to the arbitrator's jurisdiction to decide the issue of their intent, which was contentiously disputed, by submitting this dispute to the arbitrator for resolution. SouthernLINC argued to him that the parties intended to prohibit class actions, and the Customers argued that the parties intended to authorize class actions. (*See* Resp. Br. Opp. Claimant's Mot. Prelim. Clause Const. Award [1–11] at 3; Claimant's Reply Supp. Mot. Prelim. Clause Const. Award [1–10] at 2). Both parties submitted extensive briefs in support of their opposing positions regarding whether or not they intended to implicitly authorize class arbitration.[10] Unlike the parties in *Stolt–Nielsen,* the parties here did not stipulate that they had reached "no agreement" on the issue of intent prior to submitting to the authority of the arbitrator. Although the Customers later conceded that the written agreement was "silent" regarding class arbitration,[11] (Def.'s Br. Opp. Mot. Vacate Clause Const. and Clause Determ. Awards [7] at 12), this "was not the same thing as stipulating the parties had reached no agreement on the issue" prior to submitting the issue to the

arbitrator. *Jock,* 646 F.3d at 123; *see also Smith & Wollensky Rest. Group, Inc. v. Passow,* 831 F.Supp.2d 390, 392, No. 10–11498–EFH, 2011 WL 148302, at *1 (D. Mass. Jan. 18, 2011) (holding where there was no stipulation, arbitrator had authority "to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration." (citing *Stolt–Nielsen,* 130 S.Ct. at 1776 n. 10)). This later concession is not "the same as stipulating that the agreement is 'silent' on the issue of class arbitration in the sense that 'silent' was used by the *Stolt–Nielsen* majority." *Jock,* 646 F.3d at 123. "*Stolt–Nielsen* does not foreclose the possibility that parties may reach an implicit—rather than express—agreement to authorize class-action arbitration." *Id.* (punctuation and citation omitted). As the parties here did not stipulate that they had reached no agreement on the issue of class arbitration prior to submitting this issue to the arbitrator, the issue was properly before the arbitrator.

Most strikingly, SouthernLINC explicitly recognized the arbitrator's authority to decide the question of intent and insisted that he do so, asserting in its brief to the arbitrator that he "*must* examine the parties' contract to determine their intention."

---

**10.** SouthernLINC argued that the Agreement "is capable of only one reasonable interpretation: the parties' intended to preclude class arbitrations." (Resp. Br. Opp. Claimant's Mot. Prelim. Clause Const. Award [1–11] at 3). SouthernLINC then wrote seven pages of arguments encouraging the arbitrator to accept this interpretation. *Id.* at 3–10. The Customers hotly disputed SouthernLINC's assertion regarding the parties' intent, arguing that when they signed the Agreement, they "could not possibly have understood that the vague language of the Arbitration Clause constituted a waiver of any right to participate in a class action." (Claimant's Mot. Prelim. Clause Const. Award [1–9] at 4 (internal quotes and citation omitted)). The Customers further argued that "to bar class action arbi-

tration would ... limit the consumer's remedy without the requisite clear expression of intent to do so. *Id.* at 6 (citation omitted).

**11.** Although the Customers concede in their brief to the Court that the written agreement is silent regarding class arbitration and opine that *Stolt–Nielsen* stands for the proposition that "class arbitration cannot be inferred contractually if the parties do not explicitly agree to it," (Def.'s Br. Opp. Mot. Vacate Clause Const. and Clause Determ. Awards [7] ), this subsequent erroneous concession has no bearing on the parties' intent at the time of contracting or at the time the question of intent was submitted to the arbitrator for his determination.

(Resp. Br. Opp. Claimant's Mot. Prelim. Clause Const. Award [1–11] at 3) (emphasis added). Therefore, the arbitrator clearly had the power to determine whether the parties implicitly authorized class arbitration under applicable contract law principles.

### b. The arbitrator applied the law and did not impose his own policy preference on the parties

 Having determined that the arbitrator had the power to decide whether the parties implicitly authorized class arbitration, the Court must determine whether he exceeded that power by imposing his personal policy preferences rather than inquiring whether applicable law governing contract interpretation provides an appropriate default rule in this situation. He did not.

The arbitrator's proper task was to apply contract interpretation principles in order to arrive at his conclusion, which is exactly what he did. Prior to the arbitrator's ruling, SouthernLINC reminded him of his duty to apply ordinary contract law principles to resolve the dispute, stating that "[e]ven if this tribunal interpreted the arbitration agreement as 'silent' on class arbitration, the issue of the parties' intention is still one of state law contract interpretation." (Resp. Br. Opp. Claimant's Mot. Prelim. Clause Const. Award [1–11] at 3 (citing *Bazzle*, 539 U.S. at 450, 123 S.Ct. 2402)); *see also Jock*, 646 F.3d at 126 (confirming that when the "agreement contains what is argued to be an implicit agreement to submit to class arbitration, the arbitrator must necessarily look to state law principles of contract interpretation in order to divine whether such intent exists" (citing *Stolt–Nielsen*, 130 S.Ct. at 1773, 1775)). Instead of assuming that class arbitration is permitted or barred, "when there is no express authorization of class proceedings the arbitrators' proper task [is] to identify the rule of law govern-

ing in that situation." *Stolt–Nielsen*, 130 S.Ct. at 1762.

The arbitrator in the present case engaged in the exact analysis *Stolt–Nielsen* requires. Unlike the arbitrators in *Stolt–Nielsen*, the arbitrator in the present case identified generally applicable contract law principles to determine whether the parties implicitly authorized class arbitration. He explicitly rejected the approach taken by the arbitrators in *Stolt–Nielsen* and refused to consider what other arbitrators had done in similar situations. He did not assume that the parties intended to authorize class arbitration *solely* because they agreed to arbitrate disputes. Instead, he identified legal principles governing the situation: state law governing contract formation and interpretation. By engaging in this analysis and not relying on assumptions and personal policy preferences, the arbitrator here—similarly to the arbitrator in *Jock*—satisfied *Stolt–Nielsen*'s requirements and did not exceed his power.

### c. The Court cannot substitute its legal reasoning for that of the arbitrator

SouthernLINC urges the Court to reject the arbitrator's reasoning and vacate his award. It argues that the arbitrator's award should be vacated because 1) he erred when applying Georgia contract law and interpreting the Agreement against its drafter instead of assuming the Agreement's silence precluded class arbitration, 2) he misinterpreted the Agreement, and 3) he "misapplied" the doctrine of unconscionability when interpreting the Agreement. (Pl.'s Reply Supp. Mot. Vacate Clause Const. and Class Determ. Awards [11] at 9–10).

 All three of these arguments would bestow jurisdiction on this Court to vacate the arbitrator's award based on a common flawed premise: that the arbitra-

tor exceeded his power by reaching incorrect legal conclusions. These arguments fail because an arbitrator's "incorrect legal conclusion is not grounds for vacating or modifying the award." *White Springs*, 660 F.3d at 1280 (11th Cir.2011). SouthernLINC has failed to make a showing sufficient to clear the "high hurdle" necessary for vacatur because "[i]t is not enough" to show that the arbitrator "committed an error—or even a serious error." *Stolt–Nielsen*, 130 S.Ct. at 1767. Simply put, this Court has no jurisdiction under the FAA to determine whether the arbitrator applied the law correctly. *Wilko v. Swan*, 346 U.S. 427, 436–437, 74 S.Ct. 182, 98 L.Ed. 168 (1953) (The arbitrator's "interpretations of the law ... are not subject, in the federal courts, to judicial review for error in interpretation.").

SouthernLINC's first argument fails because, as explained above, the arbitrator properly looked to Georgia law governing contract interpretation and reached the conclusion that the Agreement implicitly authorized class arbitration pursuant to Georgia law. This Court cannot now second-guess the arbitrator's interpretation and application of the law to the Agreement because the question before the Court is whether he *identified* a rule of law to govern the interpretation of the contract, not whether he *got it right*.[12] *Stolt–Nielsen* does not extend this Court's authority to vacate the arbitrator's award to situations where his legal reasoning is called into question. The question properly before the Court is whether the arbitrator exceeded his power by ignoring the law and imposing his "own policy choice" on the parties rather than looking to rules of law governing contract interpretation. *Stolt–Nielsen*, 130 S.Ct. at 1770. There is no evidence that the arbitrator dispensed his own brand of industrial justice by imposing his own policy choice on the parties rather than identifying a law governing contract interpretation. Instead, he identified contract law principles in order to determine the parties' intent. Therefore, the arbitrator did not exceed his power.

SouthernLINC's second argument—that a 90–day time limitation included in the Agreement indicates that it did not intend to authorize class arbitrations[13]—fails for the same reason. (*See* Pl.'s Br. Supp. Mot. Vacate Clause Const. and Class Determ. Awards [1–1] at 19). SouthernLINC asks this Court to substitute its reading of the Agreement for the arbitrator's. This Court has no such authority under the FAA. By properly submitting the question of interpreting the Agreement to the arbitrator, the parties bound themselves to accept his interpretation, and this Court has no jurisdiction under the FAA to decide whether he interpreted it correctly or not. Therefore, his interpretation must stand.

SouthernLINC's third argument—that the arbitrator "misapplied" the doctrine of unconscionability when interpreting the Agreement—also fails for the same reason. SouthernLINC argues in a notice of sup-

---

12. Even under the "manifest disregard" standard, which itself is not a valid grounds for vacatur in the Eleventh Circuit, the question is not whether the arbitrator interpreted the law correctly, but whether the arbitrator "knew of a governing legal principle" which was "well defined, explicit, and clearly applicable," and "refused to apply it or ignored it altogether." Jill Gross, *Hall Street Blues: The Uncertain Future of Manifest Disregard*, 37 No. 3 Sec. Reg. L. J. Art 2 (2009).

13. SouthernLINC opines that "[t]his speedy process required by the parties' agreement is impossible to achieve under the [AAA class arbitration] procedures." (*See* Pl.'s Br. Supp. Mot. Vacate Clause Const. and Class Determ. Awards [1–1] at 19). However, there is no avoiding the fact that SouthernLINC waived these time constraints by engaging in discovery and submitting briefs to the arbitrator long after the 90–day period had expired.

plemental authority that the Supreme Court's decision in *AT & T Mobility LLC v. Concepcion,* — U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), supports its conclusion that the arbitrator's unconscionability analysis was erroneous. The Court in *Concepcion* held that a California law preventing courts from enforcing an express class action waiver on unconscionability grounds was preempted by the FAA under the circumstances present in that case. *Id.* However, *Concepcion* has limited applicability to the present case because it dealt with an arbitration agreement containing an *express* class action waiver, not interpretation of state contract law where the written arbitration agreement is *silent* as to class arbitration.[14] More importantly, even if the arbitrator had performed an erroneous unconscionability analysis, this Court would have no authority to vacate his award because to the extent SouthernLINC contests the arbitrator's interpretation of state law, "the FAA does not empower [this Court] to review these allegations of legal error." *White Springs,* 660 F.3d at 1281.

Considering the extremely limited grounds for vacatur allowed by 9 U.S.C. § 10(a)(4), this Court has no authority to substitute its reasoning for that of the arbitrator. If district courts were to review every arbitral award for flaws in legal

reasoning, the ensuing flood of litigation would be overwhelming. The premise that district courts can and should second-guess arbitrators' legal reasoning is fundamentally at war with the FAA's "national policy favoring arbitration with just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway." *Hall St.,* 552 U.S. at 577, 128 S.Ct. 1396 (citation omitted). Accordingly, this Court has no jurisdiction under the FAA to vacate the Clause Construction Award.

### C. Whether the arbitrator exceeded his authority by issuing the Class Determination Award

■ SouthernLINC also argues that the arbitrator "exceeded his authority" by certifying a class that did not comply with the criteria set forth in Rule 4 of the AAA Supplemental Rules for Class Arbitration (SRCA).[15] (Pl.'s Br. Supp. Mot. Vacate Clause Const. and Class Determ. Awards [1–1] at 24). However, SouthernLINC does not dispute that the arbitrator did in fact look to the correct rule and does not dispute that he had the power to apply that rule and bind the parties. Instead, SouthernLINC devotes over seventeen pages of its brief to detailed arguments purporting to show how he applied SRCA

---

**14.** This distinction is critical because when a consumer is confronted with an express class action waiver, he or she is presumably aware of the rights he or she is abandoning for the sake of having a cell phone or some other good or service. SouthernLINC argues that the Supreme Court's holding in *Concepcion* is "an even starker rejection of class arbitration" than its holding in *Stolt–Nielsen* because it upholds "an agreement that explicitly prohibits a class action." (Pl.'s Not. Supp. Auth. Supp. Mot. Vacate Clause Const. and Class Determ. Awards [13] at 3). But SouthernLINC ignores the fact that *Concepcion* is inapplicable to situations where consumers may be forced to abandon unknown rights simply because a mandatory arbitration agreement is

silent on class arbitration. In fact, the Court in *Concepcion* recognizes how important it is for class action waivers to be explicit in mandatory arbitration agreements and points out that states may require "class-action-waiver provisions in adhesive arbitration agreements to be highlighted." *Concepcion,* 131 S.Ct. at 1750 n. 6. Although the plurality opinion contains extensive dicta expressing concern over perceived problems with class arbitration, the fact remains that the agreement in question in that case had an explicit class action waiver.

**15.** Rule 4 of the SRCA substantially resembles Rule 23 of the Federal Rules of Civil Procedure, which governs class actions.

Rule 4 erroneously. (Pl.'s Br. Supp. Mot. Vacate Clause Const. and Class Determ. Awards [1–1] at 23–41). But aside from a few scattered conclusory allegations, SouthernLINC utterly fails to show how the arbitrator exceeded his power, all the while enumerating his legal errors. SouthernLINC's simple substitution of the words "exceeded his power" for the word "erred" does not alter the analysis.

SouthernLINC cites no authority indicating that a district court has the authority to vacate an arbitral award where the court disagrees with how the arbitrator applied the appropriate rules, and this Court has found none. Just as SouthernLINC's attack on the Clause Construction Award is primarily based on the proposition that the arbitrator "got it wrong," SouthernLINC asks this Court to review the arbitrator's decision as an appellate court would review a lower court decision. This Court has no such authority under Section 10(a)(4) of the FAA. As SouthernLINC simply argues that the arbitrator erred in applying the appropriate rule and fails to show how the arbitrator exceeded his authority in certifying the class, the Court has no basis to conclude that the FAA authorizes it to vacate the Class Determination Award.

## III. Conclusion

For the foregoing reasons, SouthernLINC's motion to vacate the arbitrator's Clause Construction Award and Class Determination Award [Doc. 1] is **DENIED.** The Clerk is **DIRECTED** to close the case.